[No. 11067.   Department Two.   November 3, 1913.]

JOSEPH JOHNS, *as Receiver of the Pioneer Fire Insurance Company, Respondent*, v. ARIZONA FIRE INSURANCE COMPANY *et al., Appellants.*[1]

APPEAL—REVIEW—FINDINGS.   Upon a trial *de novo*, findings of the trial court upon conflicting evidence are entitled to great weight and will not be disturbed unless clearly against the weight of the evidence.

INSURANCE—OFFICERS AND AGENTS—FRAUD—SECRET PROFIT—EVIDENCE—SUFFICIENCY.   The evidence sustains findings that the secretary and general manager of an insurance company which was in financial distress, negotiated a reinsurance contract, which was to have been the basis of a twenty-five per cent discount to his company, and that he secretly arranged with the reinsuring company for ten per cent of the discount to be paid to him personally for services and expenses in reorganizing the field (to be thereafter earned by him) as general manager for the reinsuring company to which position he was appointed, where it appears that the negotiations were by correspondence, the letters on behalf of the two companies made no reference to the 10 per cent payment, which was privately proposed at the same time through the medium of the secretary's son and accepted in the same way, and the general manager of the reinsuring company made statements indicating that his company had been willing at first to allow 25 per cent discount, which was afterwards changed to 15 per cent to the company and 10 per cent to its secretary, and that the same was kept secret from the directors and other officers of the company.

SAME—FRAUD—EVIDENCE—ADMISSIBILITY.   In an action to recover from a former officer of an insurance company a secret profit collected by him on negotiating a reinsurance contract with another company, in which the defendant claimed that the payment was made to him for services to be thereafter performed and expenses incurred, declarations of the general manager of the other company are admissible against the defendant, although not made in his presence, as tending to prove the true character of the transaction upon the issue of fraud, where both participated therein.

SAME—ACTS OF OFFICERS—SECRET PROFIT—LEGALITY OF CONTRACT.   An agreement for reinsurance, whereby the reinsuring company secretly agreed to pay 10 per cent of the unearned policies reinsured to the secretary and general manager of the other company, then conducting the negotiations, is illegal, and it is immaterial

[1]Reported in 136 Pac. 120.

that the same was regarded as pay for services and expenses in reorganizing and holding the field, as agent for the reinsuring company; since the secretary occupied a position of trust, and it was his duty to make the best bargain possible and disclose every material circumstance affecting the subject-matter of the agency.

SAME—SECRET PROFIT—RECOVERY—PARTIES LIABLE. In such a case, where the reinsuring company participated in the fraud and paid the 10 per cent after notice of the claims of the other company, it is liable to an accounting therefor, equally with the guilty officer.

Appeal from a judgment of the superior court for Pierce county, Easterday, J., entered September 17, 1912, upon findings in favor of the plaintiff, in an action on contract, tried to the court. Affirmed.

*Van Dyke & Thomas,* for appellant Arizona Fire Insurance Company.

*Higgins & Hughes (Hyman Zettler,* of counsel), for appellants Bridgeford et al.

*Burkey, O'Brien & Burkey,* for respondent.

ELLIS, J.—A statement at some length of the issues and evidence is necessary to any intelligent discussion of this case.

The plaintiff, as receiver of the Pioneer Fire Insurance Company, a Washington corporation, brought this action against the defendants, Arizona Fire Insurance Company, an Arizona corporation licensed to do business in the state of Washington, and the defendants J. H. Bridgeford and wife, for an accounting, claiming a balance of a discount, as due to the Pioneer Company on a contract whereby the Arizona Company agreed to reinsure the outstanding risks of the Pioneer Company, which balance it is alleged was secretly paid by the Arizona Company as a commission to the defendant J. H. Bridgeford, who was, at the time, secretary and general manager of the Pioneer Company and its authorized agent in negotiating the contract of reinsurance. The balance claimed was $3,307.13, less an unpaid balance of $1,-310.66 of the unearned premiums agreed to be paid to the Arizona Company in consideration of the reinsurance.

The answer of the Arizona Company denied the allegations of the complaint, and set up a counterclaim for the $1,-310.66, with interest, praying that it be established as a preferred claim against the assets of the Pioneer Company, and in the alternative, that the Arizona Company be allowed to deduct all losses paid by it on the reinsurance risks and surrender to the plaintiff the remainder of the unearned premiums and rescind the contract of reinsurance. The answer of the defendants Bridgeford and wife was to the effect that the Arizona Company agreed to reinsure the outstanding risks of the Pioneer Company for 85 per cent of the unearned premiums, allowing a discount to the Pioneer Company on the unpaid premiums of 15 per cent, and that, by an independent agreement between Bridgeford and the Arizona Company, which was one of the moving considerations to the Arizona Company for entering into the contract of reinsurance, it was agreed that Bridgeford, as general agent of the Arizona Company, should devote his time and incur considerable expense in establishing agencies and preserving the business so reinsured for the Arizona Company, and that the money received by him from the Arizona Company was not more than sufficient to meet this purpose. For convenience, we will throughout designate the two companies as "Pioneer Company" and "Arizona Company."

Certain facts are not seriously disputed. In the latter part of the year 1910, and early in 1911, the Pioneer Company was in financial straits, and its directors, anticipating a receivership for the winding up of its affairs, reinsured its then existing risks in the Arizona Company by a contract signed on March 17, 1911. At that time, Bridgeford was secretary and general manager of the Pioneer Company. He was also acting as general agent in the state of Washington for the Arizona Company, which position he held mainly for the benefit of the Pioneer Company. The contract of reinsurance was negotiated between Bridgeford, as secretary and general manager of the Pioneer Company, and one Gough, as

secretary and general manager of the Arizona Company.
The final contract was actually signed by the Arizona Company by Bridgeford as its general agent, and by the Pioneer
Company by J. L. Carman as its president, and Bridgeford
as its secretary. By this contract, the reinsuring company
agreed to reinsure all existing policies at a discount of 15
per cent upon the amount of unearned premiums, and to
accept payment of the 85 per cent in bonds of the National
Realty Company of Tacoma at their par value. The amount
thus required to be paid was $28,110.66. The Pioneer Company, in pursuance of this contract, turned over bonds of a
par value of $26,200, and on June 9, 1911, Bridgeford, who
in the meantime had been appointed and qualified as receiver
of the Pioneer Company, paid an additional sum of $600 in
cash. There then remained unpaid on the reinsurance contract $1,310.66. By an agreement between Bridgeford and
Gough, apparently consummated at about the same time
that the contract of reinsurance was entered into, Bridgeford
was retained as general agent in Washington for the Arizona
Company, and was to receive 10 per cent of the amount of
the total unearned premiums of the Pioneer Company's policies from the Arizona Company.

The conflict arises as to the character and legal effect of
this agreement. The plaintiff claims that this 10 per cent
was a secret commission paid to Bridgeford for negotiating
the reinsurance contract. The defendants claim that it was
a fund received by Bridgeford to be used in establishing the
Arizona Company in the state of Washington. The negotiations leading up to the contract of reinsurance were conducted between Gough and Bridgeford by letters and telegrams. On March 2, 1911, Bridgeford wrote to Gough,
submitting a proposition that the Arizona Company reinsure the Pioneer business, allowing the Pioneer Company a
commission of 15 per cent on the unearned premiums on the
outstanding policies. To this Gough replied by night letter
of March 7 and 8, 1911, indicating that the proposition was

favorably received, and authorizing Bridgeford to close the arrangements on the terms stated should a contingency arise requiring quick action. This was followed by a letter of March 8, confirming the telegram. On March 10, Bridgeford wired the Arizona Company, asking whether first mortgage 6 per cent bonds of the National Realty Company of Tacoma would be accepted in payment for the reinsurance. To this the Arizona Company replied by telegram of March 13, agreeing to accept the bonds. This was followed by a letter from Gough to Bridgeford dated March 13, confirming the telegram agreeing to accept the bonds, and expressing the hope that Bridgeford could engineer the deal for the Pioneer Company on the terms of Bridgeford's letter of March 2, which would enable Bridgeford to keep entire control of the business for the Arizona Company with himself as general agent. On March 17, Bridgeford wired the Arizona Company that he had closed the reinsurance contract as of noon of that day, and had forwarded the papers by mail.

On March 2, the same day of the letter from Bridgeford to Gough proposing the reinsurance contract on a basis of 15 per cent discount to the Pioneer Company on the unearned premiums, Bridgeford wrote to his son, who was then in the employ of the Arizona Company at its head office in Phoenix, stating that Gough would expect him, Bridgeford, to hold the Pioneer business, that the expense would be considerable and that he could not do this without an allowance for services and expenses above the commissions on the business, and that he considered that an allowance of 10 per cent on the reinsurance premiums would be a fair basis to allow him for reorganizing the field, appointing agents, etc., and asked his son to take the matter up with Gough at once and let him know the result. In reply, Bridgeford received a letter from his son, dated March 13, the same day upon which the Arizona Company agreed to accept the National Realty Company bonds, and finally authorized the closing

12—76 WASH.

of the contract on that basis.    In this letter, Bridgeford is advised by his son that he had talked with Gough who seemed to think Bridgeford's terms reasonable and agreed to meet them.

Bridgeford continued to act as receiver till July 15, 1911. The plaintiff is his successor.    The plaintiff's witnesses, J. P. Burkey and J. F. O'Brien, who were attorneys for the receiver, testified that on September 4, 1911, they received their first information concerning the 10 per cent paid to Bridgeford.    It appears that, in the latter part of August, Gough, conceiving that Bridgeford had misled him as to the value of the National Realty Company bonds, came to Tacoma to investigate the matter.    At that time, he called upon J. L. Carman, president of the Pioneer, and, as Carman testified, stated to him that when the matter of reinsurance was first broached, it was understood between Gough and Bridgeford that the Arizona Company would allow a discount of 25 per cent to the Pioneer Company as a commission on the reinsurance, and that Bridgeford had written Gough that he wanted the arrangement to be 15 per cent to the Pioneer Company and 10 per cent to Bridgeford.    Both O'Brien and Burkey testified that, when Gough called upon them on September 4, he stated that, when Bridgeford first took up the matter of reinsurance, the Arizona Company offered to reinsure at a discount of 25 per cent, and that Bridgeford wrote back, asking if the Arizona Company could not make it 15 per cent to the Pioneer Company and 10 per cent to him, as he would have the work of making the schedules and looking after the other details and ought to be paid for it.    Gough testified that he told Burkey, O'Brien and Carman that Bridgeford was to receive the 10 per cent, but denied that the Arizona Company ever offered a discount of 25 per cent to the Pioneer Company.    He claimed the gist of his statement was as follows:

"I said, 'Well,' or some such expression,—'this was an arrangement with Bridgeford to give him funds so that he could

carry on our general agency.' I don't know that I said, 'protect the plant to us,' but gave that understanding; I further said, 'you know, Mr. Burkey, it is quite usual in negotiating re-insurance contracts between one company and another for whoever carries on the negotiations to receive a commission; it is the same as if one man is instrumental in selling a business for another man, he would get his commission for it.' "

He also testified that the directors of the Arizona Company did not understand that they were allowing more than 15 per cent for the reinsurance risks and that the general agency contract with Bridgeford and the agreement to pay the 10 per cent to him as general agent were oral agreements. Bridgeford testified that he was originally appointed general agent of the Arizona Company for Washington with the knowledge and consent of the Pioneer Company, it being a custom among insurance companies to employ a common general agent, and that the profit accruing from business written for the Arizona Company was to belong to the Pioneer Company since it was paying him a salary; that the letters and telegrams to which we have referred constituted the entire correspondence regarding the contract of reinsurance; that he received the 10 per cent in controversy in bonds of the National Realty Company, and had spent over $2,900 after the contract of reinsurance was signed, in establishing the Arizona Company in this state, and that neither Gough nor any one else representing the Arizona Company ever, at any time, offered to allow 25 per cent of the unearned premiums to the Pioneer Company for turning over the business; that he never had a written agreement with the Arizona Company in reference to the 10 per cent in dispute; and that, though he had paid various expenses connected with his general agency for the Arizona Company subsequent to the closing of the contract for reinsurance, he never received any money from the Arizona Company to reimburse him therefor except the 10 per cent on the reinsurance, which he con-

sidered a reasonable sum to be used in establishing the Arizona Company in this state.

Upon this evidence, the court found, in effect, that Bridgeford, in violation of his duties to the Pioneer Company as its secretary and general manager, and as its agent especially authorized to procure the reinsurance, in fraud of the Pioneer Company, solicited the Arizona Company to pay him 10 per cent as a secret commission for negotiating the reinsurance, and to allow the Pioneer Company only 15 per cent discount of the aggregate unearned premiums on policies reinsured, and that the Arizona Company, with full knowledge of Bridgeford's relations to the Pioneer Company, agreed to Bridgeford's request to pay him the 10 per cent and that the amount so agreed to be paid was $3,307.13. The court further found that the Arizona Company had offered and was willing to pay for the reinsurance a discount of 25 per cent on the unearned premiums, and that, by reason of the secret agreement between Bridgeford and the Arizona Company, the Pioneer Company was defrauded and deprived of the sum of $3,-307.13. The court also found that the officers, trustees and stockholders of the Pioneer Company had no notice or knowledge of the secret agreement until after Bridgeford, as receiver, had paid to the Arizona Company $600 cash in addition to the delivery of the bonds mentioned, and then made demand upon both Bridgeford and the Arizona Company for an accounting, which was refused; that immediately on learning of the secret agreement, and before the 10 per cent had been paid to Bridgeford, and in order to prevent the rescission of the reinsurance contract which was threatened by the Arizona Company, the plaintiff offered to the Arizona Company the sum of $1,310.66, the balance due under the terms of the written contract, provided that company would agree not to pay Bridgeford the disputed 10 per cent until it could be legally determined to whom that sum rightfully belonged, which offer was refused by the Arizona Company. On these and other findings, the court made conclusions of law that the

plaintiff was entitled to judgment against the Arizona Company, and against J. H. Bridgeford and the community composed of Bridgeford and wife, in the sum of $3,307.13, with interest from March 17, 1911, less a credit in favor of the Arizona Company of $1,310.66; that the contract of reinsurance should remain in full force and effect, and that the affirmative defenses of the Arizona Company should be dismissed upon the merits. Judgment went accordingly, from which the defendants have appealed.

The many assignments of error may be epitomized in two principal contentions: (1) That the findings of the court are not supported by the evidence. (2) That the courts' conclusions and judgment are not sustained by the law.

I. This is a trial *de novo*, and we are not bound by the findings of the trial court, as we would be by the verdict of a jury. But, in an unbroken line of decisions, we have held that, even on a trial *de novo*, the findings of the trial judge are entitled to great weight, and will not be disturbed when based upon conflicting evidence unless clearly against the weight of evidence. *Helphrey v. Strobach*, 13 Wash. 128, 42 Pac. 537; *Skeel v. Christenson*, 17 Wash. 649, 50 Pac. 466; *Ford v. Jones*, 22 Wash. 111, 60 Pac. 48; *National Bank of Commerce v. Cook*, 31 Wash. 477, 71 Pac. 1094; *Poler v. Poler*, 32 Wash. 400, 73 Pac. 372; *Prospectors' Development Co. v. Brook*, 32 Wash. 315, 73 Pac. 376; *Borrow v. Borrow*, 34 Wash. 684, 76 Pac. 305; *Cullen v. Whitham*, 33 Wash. 366, 74 Pac. 581; *Chantler v. Hubbell*, 34 Wash. 211, 75 Pac. 802; *Miller v. Miller*, 38 Wash. 605, 80 Pac. 816; *Eno v. Sanders*, 39 Wash. 238, 81 Pac. 696; *Brill v. Hayford*, 41 Wash. 468, 83 Pac. 1119.

Three witnesses testified, in effect, that Gough stated to them that the Arizona Company was willing and had offered to take the contract of reinsurance on a basis of 75 per cent of the unearned premiums to that company and 25 per cent to the Pioneer Company. It is true that two of these witnesses were attorneys for the respondent, and it is true that,

according to respectable authority, such testimony should be viewed narrowly. 2 Moore, Facts, § 1107; *O'Donoghue v. Title Guarantee & Trust Co.*, 79 Ill. App. 263; *Little v. McKeon*, 1 Sandf. (N. Y. Sup'r Ct.) 607. But in this case, the testimony of the attorneys was corroborated by that of the president of the Pioneer Company, who was certainly no more directly interested in the result of the litigation than Gough was, and whose testimony was entitled, *prima facie*, to as much weight as that of Gough. Moreover, Gough admitted that he told the attorneys that the payment of the 10 per cent to Bridgeford was in the nature of a commission on the reinsurance deal, which *pro tanto* further corroborated the attorneys.

It is argued that the written evidence was entitled to more weight than any oral testimony founded upon the memory of witnesses. It may be conceded that this is the ordinarily accepted rule, but to give the letters between Gough and Bridgeford such absolute weight as contended for in a case of this character would be to close the door against the proof of fraud in almost every instance. If these men were actually intending to secretly profit by the transaction, one would hardly expect to find the evidence of that fact in letters which would necessarily be submitted to the officers of the Pioneer Company. Even when the written evidence alone is considered, it is not free from inferences tending to support the findings of the trial court. It is significant that, on the same day that Bridgeford wrote submitting the matter of reinsurance at a 15 per cent discount on the unearned premiums, he wrote his son to submit the offer to accept 10 per cent for his own pay for reorganizing the field for the Arizona Company, and that on the same day when Gough wired accepting the National Realty Company bonds and finally authorized that the deal be closed with the Pioneer Company, Bridgeford's son wrote Bridgeford that the 10 per cent arrangement with Bridgeford was also satisfactory to Gough. If the 10 per cent transaction was entirely free from shadow

in the minds of these parties, why were the negotiations touching it carried on in this unusual and roundabout way? There seems to have been a studied effort to keep out of any correspondence which would have to be submitted to the officers of the Pioneer Company any reference to Bridgeford's 10 per cent. There was an evident fear somewhere that, if those officers knew that the Arizona Company was actually allowing a discount of 25 per cent instead of 15 per cent, they might either decline the reinsurance contract or insist on receiving the full discount.

It is argued that the retention of Bridgeford's services was one of the moving considerations to the Arizona Company. That may be true, but that is no good reason why the facts should have been withheld from the Pioneer Company. That was no excuse for Bridgeford using his relations with the Pioneer Company to secretly secure the new employment, nor for the Arizona Company to connive with him in keeping the matter secret unless, by so doing, both parties to the secret arrangement profited by keeping it secret, the one by securing a liberal remuneration, the other by making payment of that remuneration without any outlay on its own part. All of these considerations doubtless influenced the trial court in making his findings, and we cannot say that they should not have done so, nor can we say that the findings are against the clear weight of the evidence.

On behalf of the appellant Bridgeford, it is urged that the declarations of Gough, in the absence of Bridgeford, could not bind Bridgeford. Viewed as mere admissions against interest, that might be true, but they were admissible in any event as tending to prove the true character of the transaction, especially in view of Bridgeford's admission that the agreement was that he should receive the 10 per cent, and the clear evidence that this fact was never disclosed to the officers of the Pioneer Company. Gough's declarations, though not conclusive as against Bridgeford, were competent to be considered in connection with the other circum-

stances in determining the nature of the transactions. On an issue of fraud, great latitude of inquiry is necessarily allowed, especially where, as here, other evidence tended to show that both parties participated in the fraudulent intent. *O'Hare v. Duckworth,* 4 Wash. 470, 30 Pac. 724; *Anderson v. White,* 18 Wash. 658, 52 Pac. 231.

II. If the findings were sufficient to support the conclusions of law and the judgment founded thereon, the judgment must be affirmed. This brings us to the crucial legal question involved: Was the agreement to pay Bridgeford 10 per cent of the unearned premiums on the policies reinsured illegal, under the circumstances, as to the Pioneer Company, for which Bridgeford was then acting as its general manager and secretary? Bridgeford's relation to the Pioneer Company was one of trust and confidence. He was its officer acting for pay, and in addition, had been intrusted with the negotiations for reinsuring its outstanding risks, and was authorized as its special agent for that purpose. It was his duty to make the best bargain possible for the Pioneer Company in effecting such reinsurance. On plainest principles of public policy, it was his duty to exercise the utmost good faith in the transaction, and to divulge to his principal every material circumstance entering into or affecting the subject-matter of his agency.

"It is well settled that an agent occupies a fiduciary relation towards his principal, and that he is bound, in the execution of the agency, to act in the most perfect good faith and with loyalty to the interests of his principal; and so sedulously is this principle guarded that all departures from it are esteemed frauds upon the confidence bestowed. An agent will not be allowed to assume any position which is inconsistent with his duty, or to acquire any rights by violation of it. This duty necessarily arises out of the nature of the relation. The principal trusts to the agent, whom he has employed, to faithfully use all reasonable efforts to advance his interests. Many details of the transaction are conducted by the agent without the principal having any knowledge thereof; and in the course of the transaction the agent ac-

quires knowledge of facts that are unknown to the principal. Thus the agent has many opportunities of acquiring an interest or benefit to himself out of the transactions, to the detriment of the principal, and against which the latter may be unable to protect himself. For this reason the law jealously guards all the agent's dealings or actions in reference to the subject-matter of the agency, and requires that they shall be strictly in good faith and loyal to the interests of his principal. . . .

"As stated above, an agent will not be allowed to assume any position which is inconsistent with his duty to be loyal to his principal, or to place himself in an attitude of antagonism to the interests of his principal. He not only will not be allowed to acquire any personal interest or advantage by an actual violation of his duty, but he also will not be allowed to take a position, without his principal's knowledge and consent, which will have a tendency to cause him to violate such duty, and to act in his own interest rather than that of his principal. If he does so, the principal may compel him to account, or set the transaction aside, according to circumstances, and no local custom or usage can be shown to avoid this rule." 1 Clark & Skyles, Law of Agency, §§ 404, 405.

"As a general rule it is a breach of good faith and loyalty to his principal for an agent, while the agency exists, so to deal with the subject-matter thereof, or with information acquired during the course of the agency, as to make a profit out of it for himself in excess of his lawful compensation; and if he does so he may be held as a trustee and be compelled to account to his principal for all profits, advantages, rights, or privileges acquired by him in such dealings, whether in performance or in violation of his duties, and be required to transfer them to his principal upon being reimbursed for his expenditures for the same, unless the principal has consented to or ratified the transaction with knowledge that a benefit or profit would accrue or had accrued to the agent. The application of this rule is not affected by the fact that the principal did not suffer any injury by reason of the agent's dealing, or that he in fact obtained a better result; nor by the fact that there is a usage or custom to the contrary." 31 Cyc. 1434, 1435.

"Unfortunately there appears to prevail in commercial circles in which perfectly honourable men desire to play an

honourable part an extraordinary laxity in the view taken of the earning of secret profits by agents. The sooner it is recognized that such secret profits ought to be disapproved by men in an honourable profession, the better it will be for commerce in all its branches." *Hippisley v. Knee Brothers,* 1 K. B. Div. 1, 7.

See, also, *Lum v. McEwen,* 56 Minn. 278, 57 N. W. 662; *Powell & Thomas v. Jones & Co.,* 1 K. B. Div. 11. These principles underlie the following decisions of this court: *Shepard v. Hill,* 6 Wash. 605, 34 Pac. 159; *Fowler v. Burke,* 13 Wash. 13, 42 Pac. 624; *Hindle v. Holcomb,* 34 Wash. 336, 75 Pac. 873; *Watson v. Bayliss,* 62 Wash. 329, 113 Pac. 770, 34 L. R. A. (N. S.) 1210. Applying these principles to the situation here presented, it seems plain that Bridgeford, occupying the position, not only of a salaried officer of the Pioneer Company, but also that of a special agent for the purpose of negotiating the reinsurance, was guilty of a violation of duty to his principal in secretly dealing with the subject-matter of his trust in such a way as to make a profit for himself. On plainest principles of equity and fair dealing, he should at least have advised the officers of the Pioneer Company of the fact that he was entering into this 10 per cent agreement for his own benefit. The consideration of the 10 per cent agreement was so intimately connected with the contract of reinsurance that ordinary good faith required that he divulge the full facts.

It is manifest that the Arizona Company, whatever the purpose of the 10 per cent agreement with Bridgeford, intended all along that he should be paid from the same fund from which the Pioneer Company received its discount or commission. It fairly appears that the Arizona Company conceived that they could handle the reinsurance of the Pioneer Company's outstanding risks with profit to themselves. at a discount of 25 per cent on the unearned premiums, and it is also plain that any reduction of this discount as going to the Pioneer Company, by a payment to Bridgeford, was a

matter which necessarily concerned the interests of the Pioneer Company. The evidence wholly fails to establish the appellants' claim that the 10 per cent contract with Bridgeford was an after consideration, entered into after the reinsurance contract had been consummated. As we have seen, the correspondence leading up to both of these contracts was passing through the mails at the very same time, that relative to the reinsurance directly between Bridgeford and Gough, and that relative to the 10 per cent agreement indirectly between Bridgeford and his son to Gough. The whole transaction, as divulged by this correspondence, bears internal evidence of the fact that, in the minds of both Bridgeford and Gough, the two agreements were interdependent and that the one would not have been entered into by the Arizona Company but ·for the other. Bridgeford thus put himself in a position where his own interests were in direct conflict with the interests of his principal, and where every effort made to further his own interests would have a corresponding influence in injuriously affecting the interests of his principal. In such a case, he must be held to account for any profit derived from his secret agreement.

There can be no question that Gough, and consequently the Arizona Company which he represented, had full knowledge of Bridgeford's fiduciary relation to the Pioneer Company, nor can there be any question but that Gough knew and appreciated the full effect upon the reinsurance contract which the 10 per cent agreement with Bridgeford would necessarily have. Knowing that Bridgeford, the officer and agent of the Pioneer Company was dealing with the subject-matter of his agency for his own benefit, Gough and the Arizona Company must be charged with a culpable participation in the legal fraud thereby perpetrated upon the Pioneer Company. Moreover, the court found—and there was evidence justifying the finding—that this 10 per cent was paid to Bridgeford after notice of the claims of the receiver of the Pioneer Company, and with full knowledge of the fact

that Bridgeford had, up to this time, kept all knowledge of the 10 per cent agreement away from the officers of the Pioneer Company. By thus knowingly performing an agreement in fraud of the rights of the Pioneer Company, the Arizona company rendered itself liable to an accounting, for the same reason and to the same extent as Bridgeford.

The further claim on Bridgeford's part that, in any event, the judgment as to him should be reduced by his expenses is without merit. These expenses in no sense redounded to the benefit of the Pioneer Company, which would be the only reasonable basis for such a claim.

There was evidence sufficient to support the findings, and the law sustains the conclusions.

The judgment is affirmed.

CROW, C. J., and MAIN, J., concur.

FULLERTON, J., concurs in the result.