[No. 42417.   En Banc.   June 13, 1974.]

THE STATE OF WASHINGTON *et al.,* *Appellants,* v. JOHN J.
O'CONNELL *et al.,* *Respondents.*

*Helsell, Paul, Fetterman, Todd & Hokanson,* by *William A. Helsell* and *Thomas W. Huber,* for appellants.

*John J. O'Connell,* pro se.

*Short, Cressman & Cable, Paul R. Cressman, William L. Hintze,* and *John O. Burgess,* for respondents Alioto.

ROSELLINI, J.—In 1960, the Attorney General of the State of Washington (the respondent John J. O'Connell) approached officers and attorneys of various public utility districts and other municipalities throughout the state advising them of the possible implications of federal indictments and prosecutions in price-fixing conspiracies involving the electrical manufacturing industry. He gave his opinion that these public bodies, having purchased electrical equipment, might have civil antitrust causes of action arising from the price-fixing; and an exploration of that possibility was begun.

The State and some of these municipalities joined together in an organization calling itself the "Washington Utilities Antitrust Group" (known as WUAG). A steering committee was selected from among WUAG members to coordinate the litigation, and officers were elected. A litigation fund was established, to be administered by the steering committee.

This organization functioned through both the investigative stage and the period of litigation of the antitrust suits which were subsequently instituted. The membership, the officers, and the composition of the steering committee varied as municipalities dropped out or were added.

O'Connell advised the attorneys and officers of the municipalities that he could not represent them in his official capacity and that legislative authorization should be obtained if they wished him to do so. A bill was introduced in the legislature for this purpose in 1961, designated Senate Bill 272; however, whether for lack of support on the part of the municipalities or because the legislature considered it inappropriate, it failed to pass. Nevertheless, with the acquiescence of the municipalities, O'Connell assumed the role of leader and coordinator of the antitrust litigation.

The investigative phase continued through 1961. During this period some WUAG members decided not to continue

because they felt there was no cause of action, or no substantial damage, or the possibility of recovery was too risky to justify the expense. Other members of WUAG decided that litigation should be pursued, but disagreed on the manner in which it should be conducted.

Thus, Snohomish County PUD withdrew from WUAG and retained its own local counsel, Edward Novak, on a fee agreement which provided for hourly compensation and a 20 percent contingent fee with a limitation of $250,000 and 10 percent thereafter.[1] Novak had been one of the original members of the WUAG steering committee. The City of Centralia also dropped out of WUAG and retained Novak on a similar fee agreement. The City of Tacoma discussed retaining private counsel in Seattle to conduct the litigation, but then decided to passively conduct the litigation through the city attorney.

The remainder of WUAG, now consisting of the State and only five municipalities, agreed that a lawyer experienced in antitrust litigation should be retained. It was agreed that representatives of the Attorney General's office, acting on behalf of WUAG and its respective members, should seek an "antitrust lawyer" to act as counsel for the members. Such lawyers in New York, Washington, D.C., Chicago, Philadelphia and San Francisco, including the respondent Joseph L. Alioto, were contacted.

Alioto was first contacted in the fall of 1961, but no agreement was made at that time to retain him. He was asked for advice, on an hourly fee basis, as to the form and contents of the complaints to be filed in the electrical antitrust litigation, but he was not otherwise retained until August 28, 1962. From January to August 1962, Alioto negotiated with members of the Attorney General's staff regarding the possible scope of services and compensation. At that time, Alioto was willing to undertake the litigation upon the basis of an hourly fee or a contingent fee of 25 percent of any recovery.

---

[1]Mr. Novak received a total fee of $47,176.47. However, he charged less than the fee agreement.

After litigation had been pending in Federal District Court for approximately 7 months, WUAG members decided that they should hire Alioto. A letter agreement dated August 28, 1962, was drafted and was submitted by O'Connell to Alioto. It provided that Alioto would represent the six entities named therein and included the proviso that the City of Tacoma might later obtain his legal services upon certain conditions. The six parties to this agreement were the State of Washington; the City of Seattle; Grays Harbor County PUD No. 1; Clark County PUD No. 1; Grant County PUD No. 2, and Benton County PUD No. 1.

The agreement provided that Alioto would represent the named plaintiffs and that his compensation would be the amount awarded by the court in any judgment, or a contingent fee of 15 percent of any amounts recovered by settlement, each with a $1-million ceiling. This letter, submitted over the signature of John J. O'Connell, directed Alioto as follows:

> This work will not be delegated by you to any associate, without my consent. Nor shall there be any association of other attorneys, nor any substitution of attorneys, without my consent.
>     . . . You shall have full authority to carry out this litigation and be directly responsible to me personally. You shall consult with me periodically on all major decisions and policy matters. Any settlement with or dismissal of any defendants requires not only my consent, but that of the several participants in the group.

The agreement further provided that any of the parties had the right to request a determination by the Federal District Court as to the reasonableness of Alioto's fees on any settlement. This procedure was never utilized. Copies of this agreement signed by O'Connell and Alioto were sent to the members of WUAG.

Alioto represented the six clients pursuant to the terms of the August 28, 1962, fee agreement. However, additional municipalities requested his services in the antitrust litigation. These requests resulted in a variety of arrangements

for association with WUAG and for attorneys' fees. The Port of Grays Harbor agreed that it would join WUAG but would not be responsible for the payment of any fee to Alioto if settlements were accomplished within a certain period of time. The Clallam County PUD retained Alioto on a 15 percent contingent fee without the original $1-million limitation. The City of Port Angeles and Klickitat and Skamania County PUDs joined WUAG and agreed to pay a 15 percent contingent fee to Alioto.

The respondent Faler, a young lawyer who had experience in the antitrust field, had been hired as an Assistant Attorney General in 1961 and soon was devoting most of his time to work in the antitrust litigation on behalf of the State and the municipalities. In addition to his state salary, he was paid a salary of $400 per month by Grant County PUD. He resigned from the Attorney General's staff in the spring of 1965 and entered private practice but was retained by the State as a Special Assistant Attorney General, and was also paid on an hourly basis out of the litigation fund raised by the municipalities. He continued to devote most of his time to the development of these lawsuits.

In 1965, when, after 4 years of pending litigation, Snohomish County was not able to satisfactorily prosecute its suits through its own local counsel, Novak contacted Faler and requested that he arrange for Alioto to be retained by the Snohomish County PUD. This was accomplished in 1965, with compensation to be based on 25 percent of any recovery in excess of the then existing offers. Snohomish County PUD did not rejoin WUAG.

In 1965 Tacoma formally rejoined WUAG by submitting its designated share of costs.

In 1964 Grant County PUD asserted a claim for damages resulting from the purchase of generators installed in the Wanapum Dam project. As a consequence, Alioto was required to prepare and prosecute a trial against General Electric which was not originally contemplated. This trial resulted in a settlement of $3.5 million for Grant County

PUD. This settlement was in addition to $4.75 million, separately negotiated with General Electric for the other appellants.

In May 1963 generators purchased by the City of Seattle for the Ross Dam project at a cost of $6.5 million were added to the litigation. Claims not originally contemplated, covering damages resulting from purchases of voltage regulators by most of the appellants, were added in 1963.

From the inception of the antitrust litigation through the year 1964, many of the appellants' representatives had been reluctant to pursue the cases and had favored acceptance of some of the initial settlement offers. Alioto had recommended to O'Connell that these offers be rejected. O'Connell in turn successfully prevailed upon local counsel or the parties to concur in Alioto's recommendation. The result was that enormously increased settlements were obtained. For example, in February 1963, Westinghouse Corporation had offered $76,000 to Seattle, and local officials had thought the offer acceptable. In the spring of 1965, Alioto negotiated a settlement from which the City of Seattle received a net recovery of $1.5 million from Westinghouse Corporation, an increase of more than 2,000 percent.

The first settlement made was with the Westinghouse Corporation, and it resulted in a recovery of $3.25 million on behalf of all the appellants. This stimulated a much livelier interest in the antitrust suits and a desire that they be given priority over other antitrust actions being litigated by Alioto on behalf of other clients.

Alioto was then preparing a trial which had not been contemplated in August 1962, when the fee agreement was signed. He had negotiated substantial settlements on products which had not originally been within his agreement. He was by that time representing the City of Tacoma and six plaintiffs who had not been involved in the suits when the original fee agreement had been signed. He was being asked to afford the WUAG cases priority treatment.

Alioto then commenced the trial on behalf of Grant County PUD against General Electric Company for dam-

ages resulting from the purchase of the Wanapum Dam hydroelectric generators. This trial resulted in a settlement of $3.5 million, which, combined with prior settlements negotiated by Alioto, resulted in an attorney's fee in excess of $1 million, based upon a 15 percent contingency. At this time there remained pending numerous cases involving many different products and approximately 24 different defendant manufacturers. During the course of the trial, having consulted with Darrell Ries, an officer of WUAG and attorney for Grant County PUD (whose claims were among the largest being asserted), and having obtained his apparent approval, O'Connell determined that the Alioto fee agreement should be changed. Prior to this determination, George Shuster, a Grant County PUD Commissioner, had also expressed the view that something should be done about the fee ceiling.

By letter dated May 4, 1965, over the signatures of O'Connell and Alioto, the August 28, 1962, agreement was modified by eliminating the limitation on fees and by Alioto's agreement to assign priority to the remaining cases. This modification agreement had been drafted, executed, and submitted by O'Connell in the same manner as had the original agreement. However, it was not sent to the various members of WUAG.

Alioto, aided by O'Connell and Faler and other attorneys whom he had hired, obtained priority status for the setting of trial dates for the appellants' cases, as a result of which settlement negotiations were accelerated.

In 1966 Alioto was advised by O'Connell that Seattle and Tacoma were asserting that they had not been advised of the fee modification and were contending that an adjustment should be made in the fees, notwithstanding that representatives of WUAG had concurred in the modification. Subsequently, this controversy was compromised and attorneys for Seattle agreed that the 15 percent fee would be paid on all future recoveries. A similar compromise was made with Tacoma.

In March 1966, newspapers throughout the state reported the total settlements made to that date and the fact that Alioto had been paid fees on these cases in excess of a million dollars. These news articles were read by officers and attorneys for the various municipalities and were filed in their records. In April 1966, officials of Grant County PUD publicly acknowledged payment of a 15 percent fee on all recoveries and praised the unexpectedly favorable results obtained in the litigation. The total settlements effected exceeded $16 million.

As each antitrust suit was settled, the parties to the complaint passed formal resolutions approving the amount of the settlement. The interest of the State of Washington in the total settlements recovered amounted to approximately 1.53 percent.

Alioto divided his fees, which he withheld when settlement payments were received, among the lawyers who had assisted him in the litigation. These included the respondents O'Connell and Faler, as well as lawyers in his own office. The division of fees was based upon Alioto's personal determination of the value of such services after they were performed. The municipal members of WUAG were not told of the fact that the fees were shared by Alioto with other attorneys.

This action was brought to compel the forfeiture of all of the legal fees paid to Alioto, including that portion which he paid to O'Connell, Faler and other attorneys.

In essence, the theories of the appellants material to this appeal were that the respondent Alioto was required to forfeit his fees because he had conspired with the other respondents to remove the ceiling of $1 million which had originally been placed on those fees, and to conceal that fact from the appellants; that the respondent Alioto had no right to share his fees with the respondents O'Connell and Faler and that the latter two were entitled to receive no compensation other than their state salaries and the salary paid by Grant County to Faler while he was an Assistant Attorney General; and that they had a right to compel

forfeiture under RCW 42.20.010 (the "conflict of interest" statute) and because of an alleged breach of fiduciary duties in failing to advise the appellants of the removal of the fee ceiling and sharing of the fees.[2]

The respondents denied that they had engaged in any conspiracy to conceal the fact of the removal of the ceiling on the fees to be paid to respondent Alioto, that there had been a breach of the conflict of interest statute, and that Alioto was not entitled to share his fees with O'Connell and Faler. The respondents denied that they had any affirmative duty to disclose the fact or the amount of those fees to the appellants, and further denied that they had breached any fiduciary duty to the appellants. Alioto alleged that he had the right to rely upon the authority of O'Connell to contract with him regarding representation of the appellants in the antitrust litigation and that the agreement had been ratified by the appellants.

Various affirmative defenses, including laches, waiver, estoppel and the ban of the statute of limitations, were alleged.

The respondents Alioto and Faler also set up counterclaims for the value of their services based upon quantum meruit. During the trial these counterclaims were dismissed on motion of the appellants. The record is obscure as to the reason for the dismissal but supports an inference that it was done upon the appellants' representation that they were not claiming to have been damaged by any of the acts of the respondents but rather were relying upon a right to compel forfeiture of fees admittedly earned. The record shows that the appellants stipulated that the total

---

[2]Since we affirm the judgment entered on the verdict in this action, we are not called upon to consider and do not pass upon the question whether an attorney who fails to advise his client of material matters affecting the client's interest must forfeit his attorney's fees, irrespective of the fact that the client has suffered no damage by reason of the nondisclosure. Proof of damage is ordinarily required in a malpractice action. See generally 7 Am. Jur. 2d Attorneys at Law § 167 et seq. And see Transcontinental Ins. Co. v. Faler, 9 Wn. App. 610, 513 P.2d 864 (1973).

fees paid were reasonable, and the jury was so instructed.

The pleadings were lengthy and contained many allegations of fact tending to support the various contentions of the parties. We believe this statement of their substance is sufficient to set the scene for a discussion of the assignments of error.

Trial of the action commenced on September 20, 1971, and the jury returned its unanimous verdict in favor of all the respondents on March 26, 1972. Motions for judgment notwithstanding the verdict or in the alternative a new trial were denied.

The appellants assign error to a number of instructions and parts of instructions and to the refusal of certain instructions which they requested. The latter were not included in the statement of facts which was originally filed with this court, consisting of 87 volumes containing 12,571 pages. Alioto pointed out in his brief that these assignments of error were not properly before the court, since the appellants had failed to comply with the requirement of Rule on Appeal I-34(9), that whenever any error is predicated upon a ruling relative to an instruction given or proposed, that instruction must be included in the statement of facts.

After the briefs of respondents Alioto and O'Connell[3] were filed, the appellants submitted a supplemental statement of facts containing all of their requested instructions, as well as the instructions given by the court. Alioto moved to strike this statement of facts, which motion was denied, this court being of the opinion that it should pass to the merits the question whether the assignments of error directed to the refusal of certain requested instructions should be considered.

In *Popovich v. Department of Labor & Indus.*, 66 Wn.2d 908, 406 P.2d 593 (1965) (followed in *Barnes v. Central Wash. Deaconess Hosp., Inc.*, 5 Wn. App. 13, 485 P.2d 85 (1971), and *Taft v. Department of Labor & Indus.*, 3 Wn.

---

[3]The respondent Faler did not file a brief on this appeal.

App. 751, 477 P.2d 651 (1970)), we refused to consider instructions not in the statement of facts and held that an attempt to cure the deficiency by filing a supplemental statement of facts after filing of the respondent's brief came too late. The reasons why we adopted this rule, which is not a new one, are set forth in *Porter v. Chicago, M., St. P. & P.R.R.*, 41 Wn.2d 836, 252 P.2d 306 (1953), and need not be repeated here.

In their reply brief, the appellants urge that the *Popovich* case is not controlling and that *King County Republican Cent. Comm. v. Republican State Comm.*, 79 Wn.2d 202, 207-08, 484 P.2d 387 (1971), governs the disposition of the question presented in this case. There this court reviewed a summary judgment proceeding, even though the record considered by the trial court was belatedly certified.

We stated that the rule of the *Popovich* case, while proper under the circumstances of the case, was not applicable in the type of summary judgment proceeding there under review. We said:

> The trial court in its judgment recited that there was no material dispute of fact, and the parties in essence agree there is none. Neither was there any diversity of view as to the underlying question of law to be resolved, *i.e.*, the interpretation of RCW 29.42.010. Because of the significant and emergent nature of the matter in dispute the normal time periods for perfecting an appeal were substantially shortened and the appellate process materially accelerated. Except for the interposition of respondent's motion, all parties, despite the abbreviated time factors, addressed ample and skillful written and oral arguments to the pertinent legal question involved. And the trial judge's supplemental certificate filed prior to the date set for oral argument, verified that the transcript before us represented no more and no less than the precise record considered by the trial court in ruling on the cross motions for summary judgment. Under these circumstances, we find no discernible or practical prejudice flowing to respondent, no unfairness to the trial judge, and no inconvenience to this court as a result of the belated certification of the record.

It will be seen that there are significant differences between that case and this. Since it was a summary judgment proceeding, the record in that case consisted of the pleadings, the respective motions for summary judgment and the attached affidavits and documents. No evidence was taken before the trial judge and only a question of law, involving the interpretation of a single statute, was presented. The appellate process was accelerated because of the emergent nature of the matter in dispute.

The lawsuit which we have before us in this case is an extremely complicated one, owing to the number of plaintiffs and the variety of theories which they advanced, as well as the volume and complexity of the testimony and the exhibits which were introduced during the trial, which lasted over a period of 6 months. Many legal questions which have not been raised on this appeal were debated before the superior court judges who tried the case.[4] Many instructions were requested and many were given. Thus the record cannot be quickly examined, as in the *King County Republican Cent. Comm.* case.

A further distinction between the *King County Republican Cent. Comm.* case and this is apparent. That case was processed on an emergency basis. Here, the appellants' notice of appeal was given May 24, 1972. Their request for an extension of time in which to file the statement of facts was granted, and the court entered an order permitting the proposed statement to be served on April 1, 1973. The appellants were not under the kind of extraordinary pressure, in preparing their briefs and examining the statement of facts, which faced the parties in the case upon which they rely.

This is not a case of an emergent nature, as was the case of *King County Republican Cent. Comm. v. Republican*

---

[4] The judge who presided over the trial during the first months, Judge Donald Gaines, died suddenly, and by order of this court Judge Stanley C. Soderland was appointed to conduct the remainder of the trial.

*State Comm., supra.* It is simply a dispute between attorneys and clients regarding the right to attorneys' fees.

■    Thus, none of the considerations which moved this court to waive its rule regarding the certification of the record in the *King County Republican Cent. Comm.* case are present here. Nevertheless, we have examined the requested instructions to ascertain whether, upon its face, any of them have substantial merit. We do not find that any of them advances a theory, properly applicable to the evidence presented in the case, which was not adequately covered by the instructions given. As the respondents point out, many of the requested instructions would have amounted to comments upon the evidence. Others, while perhaps correct as abstract statement of law, were not relevant to the appellants' claim for relief.[5] The court is not required to instruct the jury on abstract legal propositions. *Easton v. Chaffee,* 16 Wn.2d 183, 132 P.2d 1006 (1943).

---

[5]For example, the appellants requested an instruction to the effect that a fiduciary cannot retain secret profits obtained in any transaction involving property or assets belonging to the party for whom he acts. The two cases cited as authority for the appropriateness of this proposed instruction, *State ex rel. Hayes Oyster Co. v. Keypoint Oyster Co.,* 64 Wn.2d 375, 391 P.2d 979 (1964), and *Johns v. Arizona Fire Ins. Co.,* 76 Wash. 349, 136 P. 120 (1913), both involve the taking of profits on business transactions conducted by company officers. In the latter case the defendant maintained that the "discount" he received on a transaction was in reality payment for future services, but this court was not impressed with that analysis of the transaction. Also, in that case it was shown that the discount would have been allowed to the company had it not been given to the officer. There is no contention in this case that a more favorable fee agreement could have been negotiated if the respondents O'Connell and Faler had not been paid by Alioto for their services.

The term "profit" is generally associated with entrepreneurial gain as distinguished from payment for services. *See 34 Words & Phrases* 404-40 (perm. ed. 1957); 34 *Words & Phrases* 54 (Cum. Supp. 1973). *See also Webster's Third New Int'l Dictionary* at 1811 (1968). To describe as "profits" a fee paid for a lawyer's services (and it must be kept in mind that the appellants have conceded that all the fees paid in this case were reasonable for the services rendered) is so awkward that we doubt the term has ever been used in that connection. In this case the fiduciary duty of the attorney to his client was fully explained to the jury in the instructions given.

The supplemental statement of facts contains 170 pages. The reply brief does not correct the deficiency appearing in the appellants' opening brief. There is still before the court no document pointing out the pages in the statement of facts upon which the instructions, to the refusal of which error is assigned, can be found. Yet the appellants suggest that neither the court nor Alioto—who had to do additional briefing and appear in court, by counsel, to argue his motion—have been inconvenienced by the failure to comply with the published rules of court. We find it difficult to concur in this conclusion.

In a case such as this, where the trial court considered many proposed instructions and gave many, where this court is asked to overturn a verdict arrived at by a jury which listened to the testimony for more than 6 months and considered thousands of pages of exhibits, and whose integrity and conscientiousness have not been questioned, it is important that we be meticulous to ascertain that any claimed error was actually brought to the attention of the trial judge and argued intelligibly. It is therefore important that the court be able to consider an instruction refused in the light of the instructions given and with reference to the exceptions taken to the refusal and that it be certain that the designated instruction was actually submitted to the trial judge. In such a case, compliance with our ROA I-34 (9) is particularly important in order that no mistake be made and the verdict not be set aside for an alleged error which was never properly brought to the attention of the trial court.

The appellants are represented on this appeal by a large firm of attorneys. It is not unreasonable to expect a firm which is preparing a 100-page brief with approximately 50 pages of appendices, in a case which it deems important, to assign some attorney to examine the Rules on Appeal to make certain that its contentions and arguments are properly presented.

We think that if the rule stated in *Popovich v. Department of Labor & Indus.*, 66 Wn.2d 908, 406 P.2d 593 (1965),

is to have any force and effect at all, it must be applied in cases such as this one. We conclude, therefore, that the assignments of error directed to the refusal of instructions are not properly before us and need not be dealt with in this opinion.

The appellants complain of an instruction which advised the jury that it was legally beyond the authority of the State Attorney General's office to act as attorney for the non-state plaintiffs. While the appellants do not deny that neither Const. art. 3, § 21, nor any statute authorized the Attorney General to represent municipal corporations, they maintain that he was not forbidden to act as attorney for cities and public utility districts and that the jury should have been so instructed. This is precisely the position taken by O'Connell—that he was not forbidden to engage in the private practice of law, and the court instructed the jury accordingly.

As the appellants agree, all of the municipal corporations involved were authorized by law to employ counsel. They were not forbidden to employ O'Connell. However, they had no right to expect him to act for them in his official capacity. The appellants' argument is that they thought O'Connell was acting in their behalf in the course of his official duties. The evidence shows that he advised them that he had no such power, and it can be inferred that they knew that the legislature had failed, upon request, to enact a law authorizing him to represent them in his official capacity.

■ The powers of the Attorney General are created and limited not by the common law but by the law enacted by the people, either in their constitutional declarations or through legislative declarations in pursuance of constitutional provisions. *State ex rel. Attorney Gen. v. Seattle Gas & Elec. Co.*, 28 Wash. 488, 70 P. 114 (1902). *Accord, State ex rel. Hamilton v. Superior Court*, 3 Wn.2d 633, 101 P.2d 588 (1940).

The instruction complained of correctly stated the law.

Objection is made to an instruction which advised the

jury that, although a contract is void if it is entered into by a public officer who has an interest in the transaction, such a contract is not void as to anyone dealing with the public officer or employee who does not have knowledge of the facts and circumstances which constitute the violation of the statute or of any other facts and circumstances which should reasonably alert him to those facts or circumstances. They insist that such a contract is void as to all parties. The respondents, on the other hand, maintain that the instruction was correct under our holdings in *Gantenbein v. Pasco*, 71 Wash. 635, 129 P. 374 (1913), and *Shaw & Hodgins v. Waldron*, 55 Wash. 271, 104 P. 272 (1909).

We do not find it necessary to inquire into the propriety of the instruction. The only claims to which the conflict of interest statute (RCW 42.20.010) could apply were those of the State and the only public officers who might have violated it were O'Connell and Faler. Since the jury was instructed that the statute of limitations did not apply to State claims, the jury's verdict against the State and in favor of O'Connell and Faler necessarily reflects a finding that they accepted no fees from Alioto for their work on behalf of the State of Washington, a finding supported by substantial evidence, and thus had no interest in Alioto's contract with the State, and consequently that there was no violation of the so-called conflict of interest statute.

The appellants assign error to an instruction which advised the jury that the Attorney General and an Assistant Attorney General were permitted under law to engage in the private practice of law so long as they conducted their practice in a manner which would avoid conflict with their official duties. The appellants do not actually question the propriety of this instruction; their objection, rather, is directed to the court's refusal of instructions which would have qualified it. As we have heretofore ruled, such instructions are not before us for consideration.

The next assignment of error is of a similar nature. It is directed to an instruction that the canons of ethics and the lawyer's fiduciary duty to his client require him to advise

his client of any facts or circumstances which reasonably appear to be important to the client in connection with the matter being handled or in the making of any financial decision or any other important decision which the lawyer does not or reasonably should not have reason to believe the client already knows from some other source; that the duty is one of frankness, openness and candor as to matters which reasonably appear to be important to the client; but that this duty does not require a lawyer to advise his client of matters which the client already knows or which the lawyer reasonably believes the client has already learned or will be advised from some other source, or which are not important enough to the client under the circumstances of the relationship to reasonably call for disclosure, and that a lawyer forfeits his right to compensation if he violates in a substantial way his duty to his client to the detriment of the client or to the private gain of the lawyer.

As in the preceding assignment of error, the appellants do not question the correctness of this instruction. They requested an additional instruction which would have advised the jury that under the circumstances Alioto had a duty to disclose the fact that he was sharing fees with O'Connell and Faler. This requested instruction is likewise not before us for consideration.[6]

The court's instruction upon the duty of disclosure, the correctness of which was not challenged by the appellants, advised the jury in effect that the duty to disclose a particular matter depends upon the facts and circumstances of the case. The respondents introduced evidence tending to show that the appellants manifested no interest in the question of how or whether O'Connell and Faler would be compensated for their services, or what disposition Alioto would make of his fees. Their evidence also tended to show

[6]The theory which the appellants urge in support of their contention that the court erred in refusing their requested instruction is also advanced in their argument that the court should have given them judgment nowithstanding the verdict and will be discussed later in this opinion.

that the fee contract negotiated with Alioto, even after the ceiling had been removed, was so much more advantageous to the appellants than any other option open to them and that the services rendered by O'Connell and Faler were so patently valuable, that it was highly improbable if not inconceivable that the appellants would have raised any objection to the fee sharing, had they been expressly advised of it.

■ When the court instructed the jury that an attorney has a duty to disclose to his clients all facts which are "important to the client," it was referring to what are usually referred to as material facts, but using language calculated to be more understandable to the layman. A fact is material if its existence or nonexistence is a matter to which a reasonable man would attach importance in determining his choice of action in the transaction in question or the maker of the representation knows that its recipient is likely to regard the fact as important, although a reasonable man would not so regard it. Restatement of Torts § 538 (1938); see also § 551. This concept was embodied in the instruction given.

The appellants were unsuccessful in producing evidence which demonstrated to the satisfaction of the jury that the fact that fees were shared had been important or material to them at the time of the transaction. They attempted, however, to fill this evidentiary gap by offering the testimony of two lawyers and a judge who were willing to state that, in their opinion, the respondents had a duty to disclose the fee sharing arrangements. The court refused to admit this testimony and the appellants assign error to its rulings in this regard. Their assignment, however, is unaccompanied by citation of authority or by recognition of the rules applicable to the admission of expert testimony. They make no showing that there exists a field of expertise which embraces the lawyer's duty to disclose facts to his client or that the witnesses whose testimony was offered were experts in the area of lawyer-client relationships.

■■ Qualifications of expert witnesses are to be determined by the trial court within its sound discretion and rulings on such matters will not be disturbed except for a manifest abuse of discretion. *Myers v. Harter,* 76 Wn.2d 772, 459 P.2d 25 (1969). No abuse of discretion has been shown here. If the evidence was offered in an attempt to prove the law, it was improper, since the determination of the applicable law is within the province of the trial judge and not that of an expert witness. *Valley Land Office, Inc. v. O'Grady,* 72 Wn.2d 247, 432 P.2d 850 (1967). If, on the other hand, it was the purpose of the appellants in offering this testimony to place before the jury the witnesses' evaluation of the evidence in the case, it was likewise properly excluded, for not only were the witnesses not established as experts, but there was no need for such opinion testimony, the matter being one of common knowledge about which inexperienced persons are capable of forming a correct judgment. *See Gerberg v. Crosby,* 52 Wn.2d 792, 329 P.2d 184 (1958).

The appellants suggest that this testimony was necessary to counteract the statements of the respondents O'Connell and Alioto that, in their opinion, they did not have the duty of disclosing the fee sharing arrangement. These opinions were elicited by the appellants' counsel when the respondents were questioned as adverse witnesses and cannot be relied upon as a basis for a contention that the trial court abused its discretion in refusing to admit the testimony of other members of the profession who held a different opinion.

Error is assigned to an instruction which read:

Where a lawyer has a client and continues to represent that client after he associates a second lawyer to represent the client as a trial specialist, it is customary and proper for the lawyers to have an understanding between themselves that the original lawyer will be primarily responsible for dealing with the client and the second lawyer will be primarily responsible for handling the litigation. One lawyer may reasonably rely upon the other lawyer unless or until he has knowledge of facts or

circumstances which should reasonably alert him to the contrary. These factors do not change the legal duty that every lawyer owes to every client, but they may be taken into account in determining whether or not the legal duty has been fulfilled.

It is complained that this instruction is erroneous because it advised the jury that an attorney may delegate his responsibility to comply with the Canons of Professional Ethics. *In re Schroeter*, 80 Wn.2d 1, 489 P.2d 917 (1971), is cited. We there held that, although practicalities may require an attorney to delegate in good faith mechanical matters and obtain suggestions at times from other attorneys, this in no way relieves him from the personal obligation to comply with the Canons of Professional Ethics.

We are unable to perceive that the quoted instruction is open to the construction placed upon it by the appellants. It expressly states that the division of primary responsibilities among lawyers does not change the lawyer's duty to his client. We are cited to no authority which indicates that this instruction was improper.

Error is assigned to the giving of an instruction upon the statute of limitations. The instruction read:

Any party other than the State of Washington is permitted to commence a lawsuit only for a certain period of time as specified by statute. If you find that such plaintiffs, or any of them, had knowledge or notice of the facts upon which their claims, or any of their claims, are based at any time prior to January 20, 1967, then on each such claim you shall find for the defendants and against each plaintiff having such knowledge or notice. This instruction does not apply to the State of Washington.

The term "knowledge" means actual knowledge of the facts.

The term "notice" means, knowledge of facts which, if followed up diligently, would have led to knowledge of the facts on which the claims are based. Anything which is notice enough in reasonable human experience to call for inquiry is deemed notice of facts which such inquiry reasonably would have revealed. If a fiduciary relation existed between the parties so that there was an affirmative duty to disclose information, that is a factor which

you may consider in deciding what inquiry a party would be expected to make in reasonable human experience.

The plaintiffs have the burden of proving by a preponderance of the evidence that they did not have knowledge or notice of the facts prior to January 20, 1967.

Several arguments are made under this assignment. It is first contended that no statute of limitations should be applicable, the theory being that the State was required under RCW 43.09.260 to bring this action on behalf of all of the appellants. As we read that act, it authorizes the Attorney General to bring actions against municipal officers—not to represent them in actions against third parties. However, we need not inquire into the merits of this contention, since the fact is that the action was brought by the municipal appellants themselves, as well as by the State, each asserting its claims in its own behalf and not as a representative of others.

It is further argued in support of this assignment of error that the instruction was confusing because it did not differentiate between notice of the facts pertaining to the lifting of the fee ceiling and notice of the fee sharing. The instruction given correctly told the jury it was to consider the question whether the appellants had notice or knowledge of the facts upon which their claims were based, with regard to each claim. We do not think the instruction is open to the objection raised.

The next objection to the instruction regarding the statute of limitations is that it allowed the jury to speculate upon an issue not supported by evidence. *Albin v. National Bank of Commerce*, 60 Wn.2d 745, 375 P.2d 487 (1962), is cited, wherein we held that it is prejudicial error to submit an issue to the jury where there is no substantial evidence concerning it.

It is the position of the appellants that there was no evidence in the case that any of the appellants knew of the fee sharing prior to late November 1969, well within the statute of limitations. The appellants state that their claims are based in large part on the "illicit" fee sharing and that

the instruction must have induced the jury to assume that the court believed there was evidence to show that the appellants knew of such sharing of fees prior to January 1967.

There was evidence upon which the jury could find that the appellants knew or should have known of the removal of the ceiling on the fees to be paid the respondent Alioto before 1967. The instruction was proper, therefore, as applied to the claims based on the failure to disclose that change in the agreement. No instruction that the statute of limitations could be considered only in relation to those claims was requested. Error cannot be predicated on the giving of an instruction which correctly states the law applicable to the evidence but does not embody a given qualification or exception, if no limiting instruction was requested by the complaining party. *Roumel v. Fude*, 62 Wn.2d 397, 383 P.2d 283 (1963), and *Goodner v. Chicago, M., St. P. & P. Ry.*, 61 Wn.2d 12, 377 P.2d 231 (1962).

Error is assigned to that portion of the instruction on the statute of limitations which advised the jury that the appellants could not recover on any cause of action if they had knowledge or notice of the facts upon which their claims were based prior to January 20, 1967, and further advised the jury that notice is knowledge of facts which, if followed up diligently, would have led to knowledge of the facts upon which the claims are based. The objection here is that RCW 4.16.080(6), dealing with actions against officers charged with a failure to properly account for public funds, provides that the cause of action shall not be deemed to accrue until discovery by the aggrieved party of the act or acts upon which such liability has arisen or shall arise. The respondents maintain that the word "discovery"[7] refers to actual notice only. Again, this statute could apply only to

[7]We have indicated that the term "discovery" includes the concept of constructive notice. See *Easton v. Chaffee*, 16 Wn.2d 183, 132 P.2d 1006 (1943), where we said that it is the general rule that in an action based on fraud, the statute of limitations commences to run from the time of the *discovery* of the fraud, that is, from the time the defrauded person knew or should have known of its existence.

the claims of the State of Washington, since none of the respondents were officers of any of the municipal corporations, and the jury was instructed that the claims of the State are not subject to the statute of limitations. Any error in the instruction could not have been prejudicial.

The next objection advanced against the instruction on the statute of limitations is that it did not differentiate between the three causes of action set out in the appellants' complaint. It is the theory of the appellants that the 6-year statute of limitations should have applied to their second cause of action because it was based on the letter written by the respondent O'Connell to Alioto on August 28, 1962, on behalf of the appellants, which allegedly constituted a contract between the appellants and Alioto.

The trouble with this theory of the appellants is that it does not fit the allegations of the second cause of action. It is therein alleged that respondents Alioto, O'Connell and Faler agreed to the drafting and signing of a letter agreement in May 1965, which was intended to revise the original attorneys' fee agreement so as to remove the $1-million ceiling. The appellants claimed that they were not consulted about these revisions in the fee agreement and that the change was made without their approval. This cause of action makes no reference to the letter of agreement of August 28, 1962, and does not purport to have its basis in that agreement.

*Halver v. Welle*, 44 Wn.2d 288, 266 P.2d 1053 (1954), relied upon by the appellants, does not support the conclusion that the claim of appellants was one based upon a written contract. In that case the owners of a home overpaid the builder $1,000 and brought an action to seek a refund of the excess payment. We held that the 3-year statute of limitations applied but said had there been an underpayment on an amount due under the written agreement, and had the contractor been suing, the 6-year statute would have applied.

The appellants in this action are claiming a right to de-

mand forfeiture.[8] Their claims are based not on any contract but on an alleged conspiracy, breach of fiduciary duties, and statutory violations. While the validity of the 1962 agreement may perhaps be an essential prerequisite to their right to recover under these theories, this is not an action to enforce that contract or to recover for its breach. The contract might be enforceable insofar as the matters covered by it were concerned, and yet Alioto could still claim a right to recover in quantum meruit for the extra services rendered. *See* 7 C.J.S. *Attorney & Client* § 182 (1937); *Isham v. Parker,* 3 Wash. 755, 29 P. 835 (1892). The appellants' contention that this is an action based on a written contract cannot be sustained.

The appellants suggest that as to O'Connell and Faler, this was an action against former officers and employees of the municipal plaintiffs, and that the statute of limitations does not begin to run against such persons until the expiration of their terms of office. But the record is devoid of any evidence that either of these respondents was an officer or employee of any appellant other than the State of Washington; and as to that appellant, the court advised the jury that the statute of limitations was inapplicable. We find no merit in this contention.

Finally, the appellants claim that the 3-year statute is not appropriate because this was an action for an accounting[9] or an action based on a constructive trust. The appellants did not adopt or pursue these theories in the

[8]At an earlier stage, this lawsuit was viewed as one for damages resulting from a breach of the respondent attorneys' duties to their clients. *See Transcontinental Ins. Co. v. Faler, supra* at n.1, where the Court of Appeals said that the appellants must prove their employment of the respondents, the respondents' breach of a reasonable duty owed to the appellants, and that such breach was the proximate cause of loss to the appellants.

This theory of the case was apparently abandoned before it went to trial, since the appellants made no attempt to prove damages and do not claim that they have suffered any.

[9]The theory of an accounting in equity was set forth by this court in *Wester v. South Seattle Land Co.,* 174 Wash. 276, 286, 24 P.2d 633 (1933), quoting from *Grand Bay Land Co. v. Simpson,* 205 Ala. 347, 87

trial court and proposed no instructions embodying them. Failure to present an issue to the trial court precludes its consideration on appeal. *Washington Osteopathic Med. Ass'n v. King County Med. Serv. Corp.*, 78 Wn.2d 577, 478 P.2d 228 (1970).

The appellants assign error to the giving of two instructions setting forth the rules of law pertaining to the doctrine of apparent authority of an agent. It is not suggested that the instructions incorrectly stated the law or that they were unsupported by evidence. Rather it is contended that the instructions were inappropriate because a municipal corporation cannot be bound by the acts of its agent which are not expressly authorized by ordinance or resolution. The appellants quote, as conclusive authority for this contention, a statement found at 2A C.J.S. *Agency* § 158, at 795 (1972):

> *Public agents.* The rules as to the apparent authority have no applicability to public agents, whose powers are created by laws, the existence and terms of which those dealing with them are held to know.

(Footnote omitted.)

Upon turning to the footnote supporting this statement, we find only two cases cited. One of these is *Thirst Quenchers of Ohio, Inc. v. Glander,* 68 N.E.2d 671 (B.T.A. Ohio 1946). That was an appeal from an order of the State Tax Commissioner denying an application for a tax refund, on the ground that it had not been filed within the time prescribed by law. The taxpayer maintained that an employee of the Tax Commission had assured him that he would

---

So. 186 (1921), as follows:

"The mere filing of a bill for accounting implies that there were items on both sides, that the balance is uncertain, and that the true amount and to whom due must be ascertained by the court. It further implies an offer on complainant's part to pay any balance that might be found owing to the defendant without a specific averment of an offer to that effect. This is necessary to enable the court to do complete justice between the parties. Both parties are regarded as actors by the act of filing the bill, the register must state the full account between them, and the court must pass upon it, declaring their respective rights by a final decree;" . . .

supply him with a form upon which to claim the refund to which he was otherwise entitled, that he had relied on this promise and delayed the procuring of a form and filing of his claim until after the expiration of the statutory period. The court held that no officer, employee or other agent of the state or of the Department of Taxation had any authority to waive or extend the statutory limitation of time within which a taxpayer was required to file an application for a refund of taxes. Noting the rule that there can be no estoppel where there is an entire absence of power, that the Tax Commissioner and the Board of Tax Appeals were creatures of statute, having only such powers as were expressly conferred on them or necessarily implied from the powers given, that the right to a refund was required to be exercised strictly in accordance with the statute providing for it, that the examiner had no statutory duty to provide forms, that the taxpayer could easily have obtained his own form by writing to the department, and that the taxpayer had delayed more than 90 days after learning that the examiner would not supply him with a form, the court affirmed the Board of Tax Appeals. In reaching its conclusion, the court cited 2 C.J. 573, where the rule was stated:

> In the case of officers, the rules relating to apparent authority are not applicable, as the state is bound only by authority actually fixed in the officer, and his powers are limited and defined by law.

The second authority cited in the encyclopedia is *Elliott Nat'l Bank v. Western & A.R.R.*, 70 Tenn. 676 (1879). The transactions involved in that case had arisen out of the ownership and operation of a railroad by the State. The officers of the railroad were held to be state officers, whose duties and authority were prescribed by statute. The superintendent, one of these state officers, who belonged "to the class of public agents like the Governor of the State," gave notes to the plaintiffs for sums in excess of those allowed by statute, without the approval of the Governor in writing. The court held that the plaintiff could not obtain repayment of the notes, even though there may have been a

showing that the notes were issued in accordance with a "customary action" which might estop a private principal, noting that the object of the rule was to protect the public interest against loss from the " 'fraud, mistake, rashness, or indiscretion of public agents.' "

We see no reason to quarrel with the holdings of those cases as applied to their facts. It will be noted that in each case the employee or officer was one whose duties and authority were defined by statute, and in each case the act upon the basis of which estoppel (or apparent authority) was claimed was one which was beyond the statutory authority of the public agent. This court adheres to the rule that officers of municipalities have only such powers and duties as are conferred upon them expressly or by necessary implication in the applicable statutes. *Othello v. Harder*, 46 Wn.2d 747, 284 P.2d 1099 (1955).

It will be observed that if the commas are removed from the sentence quoted from the encyclopedia, it correctly states the holding of the cited cases.

In the case before us, there is no claim that there was any statutory limitation upon the authority of O'Connell (who was not an officer of any of these municipalities) to contract with Alioto on behalf of the municipal corporations or any ordinance or resolution in effect which defined or limited his power in that regard. There were in effect resolutions which authorized him to conduct the litigation, in cooperation with the municipal plaintiffs, but these resolutions did not purport to prescribe the methods or procedures to be followed or to place limits on the power to engage special counsel. There is no contention that the first agreement executed by O'Connell and Alioto in 1962 was expressly authorized by ordinance or resolution.

Not only was there no statute, resolution or ordinance to which the respondent Alioto could look to find the limits of O'Connell's power to contract with him, insofar as the appellants have disclosed, but there is none to which the attention of this court has been called.

Upon this state of facts, the implied or apparent authority of O'Connell to enter into the two agreements was of a dignity at least equal to that of his express authority. The appellants not only do not question his authority to bind them under the 1962 letter agreement, they insist that the agreement was binding upon Alioto. It would be anomalous indeed to hold that they can affirm (without formal ratification) that agreement which they find most advantageous and at the same time successfully contend that the jury was not entitled to consider the apparent authority with which they had clothed O'Connell when he, using the same form of contract which he had used in the first instance, modified that agreement to provide a larger, but still admittedly reasonable, fee.

While we adhere to the rule that a public agent cannot bind his principal when he enters into a contract which is ultra vires, even though the public body for which he acts may have clothed him with such indicia of authority that it would be estopped if it were a private person, we have often found that an implied contract has arisen, where it was entered into by representatives of a public body whose actual authority was defective where the contract was one which it was within the power of the public body to make, and have recognized the right of the contracting party to be paid the reasonable value of his services.

Such cases are *Edwards v. Renton,* 67 Wn.2d 598, 409 P.2d 153, 33 A.L.R.3d 1154 (1965) (installation of traffic signal); *Abrams v. Seattle,* 173 Wash. 495, 23 P.2d 869 (1933) (construction of light department substation); *Jones v. Centralia,* 157 Wash. 194, 289 P. 3 (1930) (construction of power plant); *O'Connor v. Murray,* 152 Wash. 519, 278 P. 176 (1929) (road contract); *Besoloff v. Whatcom County,* 133 Wash. 109, 233 P. 284 (1925) (road work); *Mallory v. Olympia,* 83 Wash. 499, 145 P. 627 (1915) (improvement of a slough); *Green v. Okanogan County,* 60 Wash. 309, 111 P. 226 (1910) (construction of a bridge); *Criswell v. Board of Directors,* 34 Wash. 420, 75 P. 984 (1904) (construction of school building). *See also Kerr v.*

*King County,* 42 Wn.2d 845, 259 P.2d 398 (1953); *and see Batcheller v. Westport,* 39 Wn.2d 338, 235 P.2d 471 (1951), where, upon rescission of an architect's contract, he was allowed to recover compensation for the reasonable value of his services, which had resulted in a tangible benefit to the county.

We have said that the acceptance of services rendered by an attorney may raise an implied promise to pay therefor; and if an attorney renders valuable services, a promise by the one receiving the benefit thereof to pay the reasonable value of such services is presumed unless the circumstances establish that they were intended to be gratuitous. *Mc-Kevitt v. Golden Age Breweries, Inc.,* 14 Wn.2d 50, 126 P.2d 1077 (1942). The cases are annotated in 100 A.L.R.2d 1378 (1965). Although we have found no case in this jurisdiction where the doctrine has been invoked or applied in a suit against a municipal corporation, we have, in a case where there was found to be an express contract employing an attorney but no agreement as to fees was included, found an implied contract to pay a reasonable fee. *Purvis v. PUD 1,* 50 Wn.2d 204, 310 P.2d 233 (1957).

While statements have been made in *State ex rel. Bain v. Clallam County Bd. of County Comm'rs,* 77 Wn.2d 542, 463 P.2d 617 (1970), *Stoddard v. King County,* 22 Wn.2d 868, 158 P.2d 78 (1945), and *Hailey v. King County,* 21 Wn.2d 53, 149 P.2d 823, 154 A.L.R. 351 (1944), that the doctrine of implied contract cannot fasten liability upon a municipal corporation for purely personal services, we think an examination of our cases, including those cited in support of that statement, will reveal that the rule is applicable only where the personal services rendered have resulted in no tangible benefit to the municipality. The general rule is to this effect. *See* 63 C.J.S. *Municipal Corporations* § 975 (1950); 1A C. Antieau, *Municipal Corporation Law* § 10.10 (1973); *see also* 1A C. Antieau, *Municipal Corporation Law* § 10.05 (1973); 10 E. McQuillin, *Municipal Corporations* § 29.110 (F. Ellard 3d ed. rev. 1966), and specifically with regard to attorney's services. 56 Am. Jur. 2d *Municipal*

*Corporations* § 224 (1971); *Edwards v. Kirkwood,* 147 Mo. App. 599, 127 S.W. 378 (1910). We cannot perceive that a person who renders services which result in a tangible benefit to a municipal corporation should be denied reasonable compensation, if such compensation is allowed to one who furnishes materials or conveys property to the municipality.

We also have recognized that the principles of equitable estoppel can be invoked against a municipality. In *Finch v. Matthews,* 74 Wn.2d 161, 169-70, 443 P.2d 833 (1968), a quiet title action in which the plaintiffs relied upon a contract whereby they had acquired certain real estate from the City in a procedure which was irregular under the applicable statutes, this court said:

> It is the general rule that the courts will not apply principles of equitable estoppel against the government or government subdivisions under certain situations. These are well summarized in the text statement found in Annot. 1 A.L.R. 2d, 340-41 (1948).
>
>> As a general rule the doctrine of estoppel will not be applied against the public, the United States government, or the state governments, where the application of that doctrine would encroach upon the sovereignty of the government and interfere with the proper discharge of governmental duties, and with the functioning of the government, or curtail the exercise of its police power; or where the application of the doctrine would frustrate the purpose of the laws of the United States or thwart its public policy; or where the officials on whose conduct or acts estoppel is sought to be predicated, acted wholly beyond their power and authority, were guilty of illegal or fraudulent acts, or of unauthorized admissions, conduct or statements; or where the public revenues are involved. (Footnotes omitted.)

Finding none of these factors, we upheld judgment for the plaintiff, saying at page 175:

> The doctrine of equitable estoppel will be applied against the state or against a municipality or other political entity when acting in its governmental as well as

when acting in its proprietary capacity, when necessary to prevent a *manifest injustice* and the exercise of its governmental powers will not be impaired thereby. 31 C.J.S. *Estoppel* § 141 (1964).

*See also Franklin County v. Carstens,* 68 Wash. 176, 122 P. 999 (1912), where the principle of equitable estoppel was applied against a county's asserting title to land acquired by it in a proprietary capacity at a county tax sale. We have also found, in a case where a property owner was damaged by the activities of a railroad company in carrying out its contract with a county, a city having annexed the property after that contract was entered into, that the city was liable to the property owner, having ratified the contract of the county by acquiescing in its benefits. *Ettor v. Tacoma,* 77 Wash. 267, 137 P. 820 (1914). This court observed that the case could be decided upon principles of estoppel, as well as those of ratification, but determined that ratification was the most appropriate theory.

It will be seen that equitable principles have been applied by this court to contractual relationships of municipalities, irrespective of whether the alleged contract was entered into in pursuit of a governmental or a proprietary function.

In support of their contention that the doctrine of apparent authority of an agent is inapplicable where the agent acts for a municipal corporation, the appellants cite the following cases: *Arnott v. Spokane,* 6 Wash. 442, 33 P. 1063 (1893); *Paul v. Seattle,* 40 Wash. 294, 82 P. 601 (1905); *Hailey v. King County, supra; Stoddard v. King County, supra; State ex rel. Dungan v. Superior Court,* 46 Wn.2d 219, 279 P.2d 918 (1955); and *State ex rel. Bain v. Clallam County Bd. of County Comm'rs, supra.*

*Jones v. Centralia,* 157 Wash. 194, 289 P. 3 (1930), in which *Arnott v. Spokane, supra,* was cited by the court, was a case in which a plaintiff sought recovery against a city upon a manifestly illegal agreement, one which was unlawful not only because of the manner in which it was made but because it was inherently void as against public

policy. Thus the contract in that case was ultra vires and would give rise to no implied contract. Nor could the doctrine of apparent authority be invoked.

*Paul v. Seattle, supra,* was a case brought by a broker to recover commissions on the sale of certain municipal bonds, which he claimed that he had earned. He had not been formally employed by the city, and the latter refused to pay the commissions. It was held by this court that, even though the plaintiff had allegedly performed his part of the alleged agreement, the principles of estoppel, ratification or implied contract were not available to him and he could recover for his services only if the contract was executed in the manner prescribed by law. To the extent that statements found in this case are inconsistent with the subsequent cases which we have previously cited, wherein equitable principles have been held applicable, it has been many times overruled *sub silentio. See, for example, Green v. Okanogan County, supra,* where Rudkin, C.J., dissenting, pointed out that *Arnott v. Spokane, supra,* and *Paul v. Seattle, supra,* were directly opposed to the doctrine announced in the majority opinion in that case. Also, insofar as the opinion discloses, the city realized no tangible benefit from the plaintiff's alleged services.

While the case has been cited as recently as 1970 in *State ex rel. Bain v. Clallam County Bd. of County Comm'rs, supra,* the strict approach taken there has generally been followed only where specific performance has been sought and the contract is executory. In *State ex rel. Bain v. Clallam County Bd. of County Comm'rs, supra,* we observed that the rule that a person dealing with a municipal corporation is bound to take notice of the limitations in its power to contract and is also presumed to have knowledge of the power and authority of the individual officer or officers with which he actually negotiates, is especially enforced where the public treasury will be directly affected by some action of the municipality. It is not suggested that the fees paid the respondents out of the settlements effected in anti-

trust suits arising out of the exercise of proprietary functions, were taken from the public treasury.

*State ex rel. Dungan v. Superior Court, supra,* was a condemnation proceeding. Certain persons who had been city officials maintained that a water and sewer superintendent had promised to locate a pipeline in a manner advantageous to them, when they conveyed certain property to the city. There was no suggestion that they had not been paid for the property. Nevertheless they claimed they had been defrauded. We said that such officials were presumed to know that they could not enter into a contract with the city, through another city official, in regard to a matter in which they had a personal interest. They were also presumed to know that they dealt at their peril when contracting with a city official as an agent of the city without first ascertaining his authority to so contract.

It will be seen that that case involved a number of facts which distinguish it from a case such as this one, where a third party has dealt with an agent of a municipality, not a municipal officer, and relying on his apparent authority, has rendered valuable services to the municipalities, resulting in a tangible benefit to each of them.

*Hailey v. King County,* 21 Wn.2d 53, 149 P.2d 823 (1944), was a case in which the plaintiff sought to recover the reasonable value of personal services which he had rendered to King County upon the strength of alleged assurances made by individual members of the Board of County Commissioners that compensation would be made. It was not contended that his services had resulted in any material benefit to the county.

We recognized in that case that the doctrine of implied contract has been applied with respect to municipal corporations under circumstances where equity and good conscience have seemed to require it. 2 J. Dillon, *Municipal Corporations* § 793, p. 1184 (5th ed. 1911), was quoted. We said that the application of the doctrine is confined within definite limitations. Its application presupposes a contract

which for some reason is unenforceable, that such contract has been fully performed and that the municipal corporation has accepted and is enjoying the benefits occurring from its performance, citing *Mallory v. Olympia*, 83 Wash. 499, 145 P. 627 (1915).

While there is language in *Hailey v. King County, supra,* which might be construed to mean that an implied contract will be found only where the city has acquired property of the plaintiff as a result of a performance of his contract, we do not find that our cases have restricted the doctrine of implied contract or estoppel within such narrow limits.

In *Chandler v. Washington Toll Bridge Authority*, 17 Wn.2d 591, 137 P.2d 97 (1943), relied upon in *Hailey v. King County, supra,* an engineer who had rendered services in the preliminary planning of a bridge under an express contract with three individuals holding a franchise to build the bridge, sought compensation from the State. This court held that the State was a third-party beneficiary under the contract and thus was under no obligation to compensate the engineer, even though it had benefited from his services. The rule of that case appears sound.

*Stoddard v. King County*, 22 Wn.2d 868, 158 P.2d 78 (1945), was another case in which the plaintiff sought to obtain specific performance of an alleged agreement for personal services which had resulted in no tangible benefit to the county. It was also found in that case that the alleged contract was a conditional one and that the condition had not occurred.

None of the cases relied upon by the appellants was decided upon facts similar to those before us. All of them were cases in which the plaintiff was seeking to enforce the alleged contract and in none of them was it found that the plaintiff had conferred a tangible benefit upon the municipality, at the request of an agent clothed with apparent authority to bind the municipality. It was not suggested in any of them that the alleged contract was made in a proprietary capacity.

Here the contract has been fully executed and it is the municipal authorities who are seeking to compel forfeiture of the payment which they have made and which was admittedly earned.

In answer to the appellants' contention that the doctrine of apparent authority cannot apply to a municipality, the respondents cite two cases which have held the doctrine applicable. They are *Fordney v. King County*, 9 Wn.2d 546, 115 P.2d 667 (1941), and *Seattle v. Stirrat*, 55 Wash. 560, 104 P. 834 (1909). In *Fordney v. King County, supra,* the county property agent contracted with one Seresum to demolish a county-owned building. The agent gave Seresum the wrong address and consequently Seresum demolished plaintiff's building. The plaintiff sued both the county and Seresum, and Seresum cross claimed against the county. The jury found in favor of the plaintiff against the defendants and in favor of Seresum on his cross claim. This court affirmed, rejecting the county's contention that the property agent had no authority to enter into such a contract.

The case was a tort action but it was necessary to decide whether the county's purchasing and property agent had authority to bind it, even though his authority was not conferred in the manner provided by law. This court said that the authority of an agent may be implied from an established course of conduct and cited *Seattle v. Stirrat, supra.*

In the latter case this court had said that the doctrine is applicable where the municipality is engaged in a proprietary function. In the case of *Fordney v. King County, supra,* the contract appears to have been made pursuant to a governmental function. No point was made of this in the opinion, however. It was the evident purpose of this court to do justice to the third-party claimant who had suffered damage as a result of the negligence of a person irregularly hired by an agent of the county.

In the case of *Seattle v. Stirrat, supra* at 564-66, we set forth the rule governing the application of the doctrine of apparent authority to acts of agents of municipal corpora-

tions, to which we felt that this court should commit itself. We said:

> A municipal incorporation possesses a two-fold character. It exercises under a grant or charter a part of the sovereign power of the state, but in thus exercising its power and to promote the ends of government and the convenience of its inhabitants, it may, and frequently does, act as an agent for the citizen.
>
> . . .
>
> With reference to its first or governmental power, it acts strictly as a public corporation. It is held by its charter and cannot be bound by any act committed *ultra vires* by its officers. It is upon this principle that the cases of *Paul v. Seattle,* 40 Wash. 294, 82 Pac. 601 [1905], and *Arnott v. Spokane,* 6 Wash. 442, 33 Pac. 1063 [1893], must be held to rest. In the exercise of its proprietary or private functions, it is held to its private contracts, and is subject to estoppels as is any private corporation.
>
> "When the municipality undertakes to supply, to those inhabitants who will pay therefor, utilities and facilities of urban life, it is engaging in business upon municipal capital and for municipal purposes but not in methods hitherto considered municipal. It is a public corporation transacting private business for hire. It is performing a function, not governmental, but often committed to private corporations or persons, with whom it may come into competition. The function may be municipal but the method is not. It leads to profit, which is the object of the private corporation. Some courts and authors therefore term the municipality in this aspect a quasi-private corporation." 28 Cyc. 125.

*Seattle v. Stirrat, supra,* was a case which arose out of the performance of a contract between the defendants in that case and the City of Seattle. The defendants had paid money to the comptroller pursuant to their custom and their understanding of their obligation. It was the city's showing that the comptroller had no authority to receive these funds. The comptroller had absconded and the city was endeavoring to recover its loss from the defendants. We held that the city was bound by the acts of its agent done in the exercise of his apparent authority.

The fact that a municipality may be bound by the acts of its agents done pursuant to their apparent authority was also recognized in the case of *Gehr v. Ferry County,* 179 Wash. 68, 36 P.2d 71 (1934). While this court found that the plaintiff had failed to establish the existence of an implied contract to extend a lease, it stated the rule to be that, where a municipal corporation has entered into a contract which for some reason may be void (either through jurisdictional defect in the proceedings leading up to the contract or want of authority of the officer undertaking it to bind the municipality), the municipality will not be permitted to retain the benefits of labor and material furnished pursuant to the contract without paying its reasonable value. We said that in all of the cases cited therein in support of the stated rule, there was real or apparent power in the body or officer entering into the contract to bind the municipality.

Most of the appellant municipalities were proprietary corporations, having as their sole function the conducting of a business for the benefit of the community, and those which had governmental functions were participants in the antitrust litigation as a result of expenditures made in pursuit of their proprietary functions. It is not contended to the contrary.

In the production and sale of electricity, a municipal corporation acts in its proprietary capacity. *State ex rel. Northwestern Elec. Co. v. Superior Court,* 28 Wn.2d 476, 183 P.2d 802, 173 A.L.R. 1351 (1947), *and see Washington Natural Gas Co. v. PUD 1,* 77 Wn.2d 94, 459 P.2d 633 (1969). 2 C. Antieau, *Municipal Corporation Law* § 19.14 (1973).

It is not suggested that any of the appellants lacked authority to engage the services of O'Connell to coordinate their antitrust litigation or to authorize him to contract with Alioto to represent the appellants in the conduct of that litigation.

Not only have we expressly held that the doctrine of apparent authority may be invoked against a municipal

corporation where it exercises a proprietary function, but we have also recognized that the equitable principles of estoppel and implied contract, in both of which "apparent authority" plays a part, may apply, even where the function being performed is governmental, provided the particular contract is not ultra vires.

The principles to be derived from all cases are: (1) if there was no contract, express or implied, and the plaintiff was a mere volunteer, he cannot recover compensation; (2) even though there was an express contract, if it was ultra vires, the plaintiff ordinarily cannot recover upon either the contract itself or an implied contract, even though he has performed in reliance upon the authority of the agent with whom he has contracted;[10] (3) if there was an express contract but the agent or agents with whom the plaintiff contracted lacked authority to enter into it because of some procedural or other defect and the plaintiff, without having himself performed, seeks to obtain specific performance, the court will not enforce the contract, even though it was one which was within the power of the municipality to make; (4) if the alleged contract was one for purely personal services, resulting in no tangible benefit to the municipality, the court will not find an implied contract; (5) if, on the other hand, such an express contract has been performed by the plaintiff with the result that a tangible benefit has been conferred upon the municipality, and he seeks to hold the municipality liable under its terms, the court will not enforce the contract itself but will hold the municipality liable to pay the reasonable value of the benefit or services, finding an implied contract upon the theory of unjust enrichment; (6) the doctrine of apparent authority may be invoked against a municipal corporation in the

[10]This principle includes the rule that one dealing with a public officer whose powers are defined by statute is presumed to know the limits of those powers. That rule disposes of a theory which is implicit in a number of the contentions of the municipal appellants—namely, that they had a right to rely on the apparent authority of the Attorney General to represent them at the expense of the state.

exercise of its proprietary functions and will be applied in a case where it is necessary to do justice between the parties.

Insofar as we have been able to ascertain, we have never been asked to set aside a contract of a municipality which has been fully performed on both sides, upon the ground that it was not properly authorized; and no case has been cited in which a court has done so.

The legislature in removing the immunity of the State and its subdivisions from tort liability (*see* RCW 4.92.090, *Kelso v. Tacoma,* 63 Wn.2d 913, 390 P.2d 2 (1964)) and our cases applying the doctrine of apparent authority where proprietary functions are involved and the doctrines of implied contract or estoppel where agents of a municipality have purported to act for it and entered into a contract which, though not expressly authorized, is within the corporate powers, all indicate that it is the developing tendency of both the legislature and the courts to recognize that public bodies should be held to the same standards of conduct in dealing with private citizens that are imposed upon the private citizens themselves. The purpose of the rules protective of public bodies is to prevent fraud, mistake, rashness, or indiscretion of public agents, it is not their purpose to foster unjust enrichment; and where the application of such rules would produce that result, we have found that equitable principles properly can be invoked.

Upon the facts of this case, we think the trial court properly held that the doctrine of apparent authority could be invoked.

The municipalities, while insisting that the respondent Alioto was required at his peril to ascertain whether the respondent O'Connell had express authority to enter into the 1965 modification of the original agreement, conferred by ordinance or resolution, are themselves relying upon a contract authorized with no greater formality than the 1965 modification. Only five of them were participants in the antitrust litigation at the time the first agreement was signed by O'Connell and Alioto. They point to no evidence

that any of these had formally authorized either the designation of O'Connell as their agent, or his employment of Alioto as their special counsel.

If there was authority at all, insofar as the evidence cited in the briefs of the appellants discloses, it was an authority implied in resolutions authorizing the municipal corporations and their attorneys to join with the Attorney General in pursuing the antitrust litigation. Those resolutions do not expressly empower the corporate officers or attorneys to designate O'Connell or anyone else their agent or to employ special counsel. Yet it is not denied that the appellants all acquiesced in O'Connell's management of the litigation and his employment of Alioto.

The 1962 agreement to pay a contingent fee of 15 percent, with a ceiling of $1 million, was not formally authorized, for aught that is shown by the appellants, nor was it formally ratified. The only ratification which their statement of the facts shows is an implied ratification, by those who were at the time participants in the litigation, flowing from their failure to object after the respondent had sent them copies of the letter agreement. Of those appellants who joined the group after this agreement was entered into, at least two (Snohomish County PUD and Clallam County PUD) made separate agreements which included no fee ceiling.

It might also be inferred that all of the appellants (except those having separate agreements) impliedly ratified both O'Connell and Alioto agreements when they formally approved the settlements which were entered into with each defendant in the antitrust cases and accepted without question the check which each received as its proportionate share.

Not only do our cases indicate that the doctrine of apparent authority properly can be invoked in a case such as this, where the function with which the contract is concerned is proprietary rather than governmental, the contract is one which it was within the power of the municipality

to make, and the municipality has received substantial benefits as a result of its performance; but we think the appellants must be estopped to question the propriety of an instruction advising the jury that it can consider this doctrine, when they themselves have asserted the validity of a contract entered into with no greater formality than that which they claim was unauthorized and to which less than half of the appellants were parties. Having conducted their relations with the respondents with a casual informality from the inception of the antitrust litigation and relying themselves upon an agreement informally approved, they cannot now be heard to say that the respondent Alioto was not entitled to rely upon the apparent authority of their agent.

We find no reversible error in the giving of instructions. Under the instructions which the court gave, the appellants could and did argue to the jury their theories which were applicable under the pleadings and the evidence.

It is earnestly argued by the appellants that the trial court should have directed a verdict or granted them judgment notwithstanding the verdict. The arguments which are made in support of this contention all assume that the jury was obliged to accept that version of the evidence which was most favorable to the contentions of the appellants and to reject that which supported the position of the respondents. This, of course, is not the law.

Our state constitution, article 1, section 21, provides that "the right of trial by jury shall remain inviolate." In *Jensen v. Shaw Show Case Co.*, 76 Wash. 419, 421, 136 P. 698 (1913), this court said concerning that article:

> This provision is pregnant with meaning. The courts have no right to trench upon the province of the jury upon questions of fact. It is only where there is no evidence, either direct or circumstantial, which warrants the verdict of the jury, that the courts may interfere. In proper cases, the jury is an arm of the court; its province is to find the facts, and the province of the court is to declare the law.

Where motions for judgment notwithstanding the verdict or a new trial are denied, the verdict of the jury is before us, reinforced by the trial judge's approval, or, if not approval, his recognition that there is no reason why the verdict should be set aside. *Coppo v. Van Wieringen,* 36 Wn.2d 120, 217 P.2d 294 (1950), and *Fogarty v. Northern Pac. Ry.,* 85 Wash. 90, 147 P. 652 (1915).

As we have said on so many occasions, this court will overturn a jury's verdict only rarely and then only when it is clear that there was no substantial evidence upon which the jury could have rested its verdict. *Valente v. Bailey,* 74 Wn.2d 857, 447 P.2d 589 (1968), and cases cited. This court will not willingly assume that the jury did not fairly and objectively consider the evidence and the contentions of the parties relative to the issues before it. *Phelps v. Wescott,* 68 Wn.2d 11, 410 P.2d 611 (1966). The inferences to be drawn from the evidence are for the jury and not for this court. The credibility of witnesses and the weight to be given to the evidence are matters within the province of the jury and even if convinced that a wrong verdict has been rendered, the reviewing court will not substitute its judgment for that of the jury, so long as there was evidence which, if believed, would support the verdict rendered. *Burke v. Pepsi-Cola Bottling Co.,* 64 Wn.2d 244, 391 P.2d 194 (1964).

There was evidence upon which the jury could find that the plaintiffs in this action (other than the State of Washington, for whom O'Connell, as Attorney General, was authorized by statute to act) informally authorized O'Connell to represent them in organizing antitrust litigation, that they authorized him to secure the services of Alioto, to agree upon a contingent fee of 15 percent and to conduct all of their business with him; that, although a ceiling of $1 million was originally imposed upon the fees to be paid to Alioto, it was never contemplated that the amounts which would be recovered in the antitrust suits would be sufficient to make this provision operative; that additional services were required of him which justified the removal of

this ceiling, and that the removal was done by O'Connell with the acquiescence of leaders of the appellants' antitrust group.

The jury also could find that Faler also worked upon the cases, devoting most of his time to the antitrust litigation over a period of years, with the consent and acquiescence of the municipal appellants; and that the remuneration paid him by the municipalities was not adequate compensation for the services he rendered. It could find that the services of O'Connell and Faler were valuable to Alioto, as well as to the municipal appellants, and that the fees which he shared with them were reasonable and proper.

The jury also could find upon the evidence presented that O'Connell and Faler accepted no fees for work which they did for the State of Washington; that, although they used state stationery and O'Connell used the title "Attorney General" in correspondence regarding the lawsuits, this was proper since the State was a party to the action, albeit holding only a small fraction of the total claims, and that these things were done with the approval of the other appellants and in no way deceived them; that while the services of state employees were used, complete reimbursement was made to the State for all state time and equipment used in behalf of the non-State plaintiffs.

The jury also could find that the officers and agents[11] of the municipalities had, prior to 1967, notice of facts which should have caused them to inquire as to whether the fee ceiling had been removed and what arrangements were being made for compensation of O'Connell and Faler, if they considered these questions important. Since the jury found against the State on the merits on its claims against the respondents O'Connell and Faler, however, it is reasonable to conclude that its verdict as to the other appellants was also based upon the merits, and not upon the running of the statute of limitations.

[11]A number of the attorneys for the municipalities, who were not elective officials, also received substantial contingent fees paid out of the antitrust settlements apportioned to their respective clients.

The municipalities insist that the respondents had a duty, as a matter of law, to advise them of the fact that the fee ceiling had been removed and of the fact that Alioto was paying O'Connell and Faler for their services in assisting him. No case is cited which supports this contention. Under the applicable instruction given, which the appellants concede is a correct statement of an attorney's duty, the jury was entitled to examine the evidence, to draw the inferences from it which it deemed reasonable, and to determine whether the officers and agents of the municipal appellants knew or should have known of these matters and whether they were important to them.

The jury was entitled to consider the obvious fact that where cases of the size and complexity of those which were handled by the respondents in this suit are being litigated, all the lawyers involved could not be expected to be in communication with all of the plaintiffs. As the record shows, each of the municipal corporations was represented by its own counsel in its dealings with O'Connell and Faler. Because the various municipalities were located in different parts of the state and perhaps for the additional reason that their officers and agents in many instances were dubious about the value of the antitrust claims, only a few of the attorneys (mainly members of the steering committee of WUAG) had more than occasional contact with O'Connell and Faler and none ever discussed the employment contract with Alioto, who dealt primarily with O'Connell, as he was told to do in the original agreement and as the evidence showed it was intended by the appellants that he should do.

The jury was entitled to take into consideration also the fact that the handling of these cases was left almost entirely in the hands of the respondents, and that the chief interest of the various appellants appeared to be in learning the amount of settlement offers as they were made from time to time and determining whether the settlements should be accepted. Upon the evidence the jury could reasonably find that the officers and attorneys of the appellant

municipal corporations were not concerned about the question whether Alioto should be allowed additional compensation for responsibilities not contemplated when the first fee arrangement was made, or about the question of how or whether O'Connell and Faler were being compensated for their services on behalf of the municipal corporations.

The jury could take into account the fact that attorneys and officers of each municipal corporation had knowledge of its proportionate interest in the total settlement in each case and the total amount thereof, and the amount which it was paid, and could easily have computed the attorneys' fees. It could also infer that the knowledge which these attorneys and officers had that O'Connell and Faler were rendering extensive and valuable services in their behalf, should have caused them to inquire as to how these services would be adequately compensated if, in fact, they were interested in that question.

The jury also could consider the undisputed evidence that Alioto, with the help of O'Connell and Faler and other attorneys (in whose identity and the amount of whose compensation the municipal appellants appear to have no interest) secured for the appellants benefits far more substantial than they could have obtained had they been represented by any other attorneys whose services were available, and that the fees exacted were lower than any other attorneys had indicated a willingness to accept. They also could consider the evidence that none of the original parties anticipated that recoveries in the antitrust litigation would be so great that the fee ceiling would become applicable, and to infer that they would not have imposed such a ceiling if this development had been foreseen.

This evidence was significant for the jury to take into account in considering whether the fact of the removal of the ceiling and the sharing of fees were matters of material interest to the municipalities. The jury also could consider the absence of any evidence tending to show that the municipalities would have pursued a different course had they been expressly notified of these things.

The appellants suggest that it would be unconscionable for this court to condone the conduct of the respondents in failing to affirmatively advise them of the fee arrangements. Judging the conduct of the parties was the jury's function and is not that of this court. The jury, an admittedly representative and fair one, exercising the conscience of the community, did not need to approve O'Connell's negligence or reticence in the matter of advising the plaintiffs about the fee revision or the fact that he was paid for his services on behalf of the municipalities in order to conclude that the respondents had earned their fees and that the alleged facts upon which the right to forfeiture was claimed had not been proven.

■ It should not be surprising that the diligent research of counsel and of the members of this court has not disclosed a case in which a court has considered the right to compel forfeiture of attorney fees under circumstances like those involved here. It is hardly to be expected that, in the normal course of human relations, the client who has paid his attorney a reasonable fee for services which have admittedly resulted in a substantial and unexpected benefit to the client, will seek to obtain a refund of the entire fee upon the assertion that he was not aware of the amount that was being paid or that the fee was shared with other attorneys who admittedly rendered services with the knowledge of the client. The case is thus *sui generis.* Forfeitures are not favored in the law. *Clausing v. DeHart,* 83 Wn.2d 70, 515 P.2d 982 (1973); *and see Leonard v. Seattle,* 81 Wn.2d 479, 503 P.2d 741 (1972). The jury's verdict was in harmony with this principle.

It would be unconscionable for this court to set aside the verdict—after the jury sat for more than 6 months, listening to the witnesses and considering the evidence—in the absence of a clear showing of error in the conduct of the trial. Such a showing has not been made.

The record shows that the appellants were given a very long day in court. It is not suggested that either the judges

who presided over this case or the jury which decided the facts were swayed by passion or prejudice. The verdict is supported by substantial evidence and will not be disturbed.

The respondent Alioto has cross-appealed, assigning error to the Superior Court's refusal of his motion for attorneys' fees which was based upon RCW 4.28.185(5). That statute provides that in the event a defendant is personally served outside the state on one of the causes of action enumerated therein and prevails in the action, there may be taxed and allowed to him as part of the cost of defending the action a reasonable amount to be fixed by the court as attorneys' fees. The trial court was of the opinion that this provision is discretionary and not mandatory. We think that is the proper interpretation to be placed upon it. See Andersen v. Gold Seal Vineyards, Inc., 81 Wn.2d 863, 505 P.2d 790 (1973). That being the case, this court will not set the trial court's ruling aside in the absence of a clear showing of abuse of discretion. We do not find that such a showing has been made.

The question of whether attorney's fees should be allowed to the respondent Alioto in this court is one which we will consider upon proper application.

Since we have reached the conclusion that the trial was conducted without error insofar as the appellants' contentions are concerned and that the judgment entered on the verdict should be sustained, it becomes unnecessary to discuss a second assignment of error directed to the dismissal of the respondent Alioto's counterclaim.

Costs of this appeal will be borne by the appellants in ratio to their respective interests in the antitrust litigation.

The judgment is affirmed.

FINLEY, HUNTER, and HAMILTON, JJ., and EVANS and WIEHL, JJ. Pro Tem., concur.

BRACHTENBACH, J. (dissenting)—The majority's cavalier approach to this case is well illustrated by its characteriza-

tion that this is "simply a dispute between attorneys and clients regarding the right to attorneys' fees."

No characterization can obscure the fact that what this case actually involves is the secret acceptance of $802,814.16 by the highest legal officer of the state and his deputy. These funds were received without the knowledge, consent or approval of any of the antitrust litigants. This violates the canons of ethics and the attorneys' oath of office.

This court has an opportunity to interpret and affirm the high fiduciary duties of lawyers, but the majority largely avoids the issues by reliance on a highly technical appellate rule.

While the 6-month trial, represented by about 13,000 pages of testimony, resulted in many legal questions being raised on appeal there is only one core issue and that is whether a lawyer can share fees without the knowledge, consent and approval of his client. The canons and the authorities all say no. The majority stands alone in saying yes.

Public respect for the legal profession will be no higher than the ethical standards which are demanded of each lawyer. Moreover, it cannot be forgotten that we are here reviewing the professional conduct of our highest elected legal officer, an attorney chosen to represent all Washington citizens, the Attorney General. Thus, the entire legal profession is under scrutiny in this litigation, for "if gold rust, what shall poor iron do?" Chaucer, *The Canterbury Tales, The Prologue*. At issue is the fundamental nature of a lawyer's fiduciary duty to his client. Standing alone, the concession by the former Attorney General and his assistant that they received $802,814.16 in private funds during their employment by the state coupled with the contention that their nonstate "clients" knew nothing of such compensation leaves no doubt as to the immense public significance of the court's decision herein. By ignoring much of the uncontroverted testimony and by relying on a highly tech-

nical procedural rule, the majority puts its stamp of approval on conduct which so clearly violates the fiduciary duties of a lawyer that it should be so held as a matter of law. The sanctity of a jury verdict is used by the majority to obscure the major issue in the case. The majority's recitals of what the jury could have believed do not justify the verdict if there should have been a contrary ruling as a matter of law, or if the jury instructions contained error. I believe both errors occurred as to O'Connell and Faler.

It is appropriate to set forth additional operative facts before discussing the legal theories upon which I base my dissent.

In his capacity as Attorney General, John J. O'Connell learned of federal action concerning price fixing among electrical equipment manufacturers. In pursuit of possible antitrust litigation, a meeting of representatives of various municipal corporations was called by O'Connell and held on January 5, 1961, in the Attorney General's office. A memo summarizing that meeting was mailed to various municipalities. It contains these summaries:

> It was agreed by the group that each representative would bring before his local legislative body the need for authorization *to the Attorney General* to act for and on behalf of the municipality as legal counsel . . .

(Italics mine.) Attached thereto was a sample ordinance which included the following language:

> An Ordinance pertaining to the recovery of certain claims; empowering the Attorney General of the state of Washington to act for and on behalf of (city or P.U.D.) in the recovery of those claims; . . .
>
> . . .
>
> The Attorney General of the State of Washington has commenced the preliminary study necessary to institute action on behalf of the state of Washington and this (city or P.U.D.) believes that it is in the public interest that all affected municipalities join with the Attorney General in such action.
>
> [I]t is believed that (city or P.U.D.) should join with other affected municipalities in authorizing the Attorney

General to act as their legal counsel for this purpose, in order to consolidate efforts and minimize the expense.

. . . The Attorney General of the state of Washington, together with the members of his staff, are appointed and empowered as special counsel, to act for and on behalf of the [municipality] . . .

It is uncontroverted that there was absolutely no express disclosure to the various plaintiffs that O'Connell and his deputy Faler were to share fees with Alioto, who was ultimately engaged to prosecute the cases. O'Connell received $530,401.05 and Faler received $272,413.11.

O'Connell argues that he was acting as a private attorney and that the municipalities must have known that he was representing them as such because he could not legally represent them as the Attorney General. But the pertinent question is not whether in retrospect this court agrees that O'Connell could not legally represent the nonstate plaintiffs as Attorney General in the antitrust litigation; rather, the question is whether those *plaintiffs believed* that O'Connell *was* representing them in his capacity as Attorney General.

The documents in evidence created the overwhelming impression that O'Connell was acting as Attorney General in behalf of all plaintiffs. All correspondence was on the letterhead of the Attorney General, signed by O'Connell as Attorney General or Faler as Assistant Attorney General. Representative contents are revealing; for example, a letter on September 27, 1961, to each public entity said, in part:

It seemed then, as it does now, that as a matter of public policy the state was perhaps in the best position to assume the responsibility for coordinating these efforts . . . From now on we are prepared to continue to offer our services in assisting the coordination of litigation in the same way as in the past. We are not prepared to assume responsibility for representing the total interests of all of the public entities desiring to participate in such a joint venture.

When the complaint was filed in federal court, it was verified by O'Connell, under oath, as follows:

That he is the Attorney General of the State of Washing-

ton, one of the plaintiffs herein, and *as such* has been authorized to sign all pleadings for and on behalf of all parties plaintiff.

(Italics mine.)

By letter dated August 28, 1962, Alioto was retained. The letter was on the Attorney General's stationery and signed by O'Connell as Attorney General. Copies were sent to all of the members of the Washington Utilities Antitrust Group (WUAG).

The understanding of various municipalities is reflected in correspondence. For example, the attorney for a PUD wrote O'Connell, as Attorney General, with the following comments:

> The commissioners . . . asked me to indicate to you their sincere appreciation of your efforts . . . and the *rest of your staff* . . . It has occasioned quite a load *for your office* . . .

(Italics mine.) In another instance a city utility wrote to O'Connell to express appreciation for the fine work done *"by your office."* (Italics mine.) In still another letter from Faler to one of the utilities it was said:

> John J. O'Connell agreed to undertake coordination of the case on behalf of all concerned and to assign a portion of his staff to the endeavor.

The state auditor's report on the WUAG activities contains these statements:

> The Attorney General provided leadership and coordinated operations of this group. The Washington Utilities Group (WUAG), which acted as liaison between the litigants and Joseph L. Alioto, was operated as a section of the consumer protection division of the Attorney General's office from June 1961 to June 1965.

This view is consistent with the beliefs of the Assistant Attorney General originally heading the Attorney General's antitrust division when the litigation was being organized. He testified that he believed that the Attorney General was only representing the State of Washington and acting as a coordinator for the other agencies. He had no

knowledge that O'Connell or Faler considered that they were acting as private attorneys or that there was to be any fee sharing.

At a meeting with the Tacoma Utility Board, O'Connell urged the hiring of Alioto. E. K. Murray, veteran Tacoma lawyer and a member of the utility board, testified that O'Connell insisted that he, as Attorney General, had the right to run the entire lawsuit. Murray said:

> Nothing at all was said about him acting in any private capacity for us . . . He couldn't be our attorney in any private capacity without our having engaged him to act as such, there had been no discussion or even suggestion of that kind. In fact, he was arguing that he had a right to run the case without our say.

An attorney representing four of the public utility districts testified that at no time were there any discussions with O'Connell or Faler with regard to their being retained as attorneys for his client, even though O'Connell insists that he was acting in that capacity. Another PUD attorney said that the Attorney General ran the WUAG, that he was the executive officer and specifically that "he voluntarily assumed this chore and placed his man in charge and we just relied on him totally."

As late as 1963 the Attorney General's office was still referring to its coordinating efforts. When the first case was settled, the Attorney General's office issued a news release stating in part:

> *Attorney General John J. O'Connell* announced today the first out of court settlement in a series of lawsuits . . . *Upon recommendation of the Attorney General's office* the port commissioners formally accepted a settlement . . . *The Attorney General's office* is coordinating the series of lawsuits. Ernest Ingram of the firm of attorneys for the Port of Grays Harbor represented the Port in its suit in settlement negotiations *in cooperation with O'Connell's office.*

(Italics mine.)

An interesting and revealing event occurred in federal district court. At a pretrial conference shortly before the

Grant County PUD trial, Mr. Alioto asked permission of District Court Judge Boldt to have O'Connell seated at the counsel table during trial. Objection was made by defense counsel to this since the State had been dismissed as a party plaintiff. Judge Boldt stated that if O'Connell were at counsel table the judge would have to admonish the jury and make it plain that the State had no interest and they were not to so infer from the fact that O'Connell was participating. Not even a suggestion was made that O'Connell was there as a private attorney or representing other plaintiffs because the request was dropped or withdrawn and O'Connell did not appear at the trial.

O'Connell could recall no other instance in his 12 years as Attorney General of engaging in private practice.

Turning now to the events in 1965, we must examine the circumstances whereby the total fee limitation of $1 million, contained in the original agreement, was removed from the 1962 agreement. That original 1962 agreement provided a 15 percent contingent fee with a total maximum of $1 million. When the Grant County PUD case was settled on May 4, 1965, the fee due Alioto, for that and prior settlements, was $1,012,500. O'Connell and Alioto agreed that for those fees, O'Connell would receive 10 percent or a total of $101,250. Shortly thereafter O'Connell and Alioto agreed that in the future they would share fees on a 50-50 basis.

An agreement removing the fee limit was prepared by Faler, dated May 4, 1965, the same day the fee limit was exceeded, and signed by O'Connell as Attorney General and accepted by Alioto.

Within approximately 1 month after removal of the fee limitation, O'Connell received his check from Alioto for $101,250. While the original Alioto agreement was furnished to each participant and approved by them, no such approval was obtained for the fee removal. In fact no notice of the change or copy of the revised contract was submitted to any plaintiff. O'Connell said that he thought Faler had

distributed such notice, but Faler testified that O'Connell had told him not to do so.

There was a brief discussion during the Grant County PUD trial between O'Connell and the attorney for the PUD who was also a member of the steering committee for WUAG. O'Connell asked the attorney what he thought about removing the ceiling since Alioto had other cases in California and if the limit were not removed, O'Connell feared that Alioto would put the California cases ahead of the Washington cases. The attorney said he didn't think there was anything else O'Connell could do. O'Connell argues that this brief discussion constituted ratification by WUAG of the fee limit removal. However, the contract was modified in 1965, while the WUAG steering committee never met after 1961. The PUD attorney never was asked to submit the revision to the whole steering committee or anyone else.

About the same time one of the Grant County PUD commissioners suggested that the fee limit be raised to give Alioto incentive to handle the remaining cases. He testified he did not know the limit was to be *removed* and that his suggestion was that of raising the limit rather than eliminating it.

It is these brief conversations which the majority describes as constituting acquiescence of leaders of the WUAG. Neither O'Connell nor Faler mentioned to the attorney or the commissioner that they would share in the increased fees. Bearing in mind that the WUAG had had no meetings for 4 years and that its officers were sometimes designated by the fiat of Faler's action, these few, informal communications cannot be elevated to the legal equivalent of proper acquiescence on behalf of all of the nonstate plaintiffs.

Another interesting event took place about the same time. O'Connell and Alioto discussed the possibility that O'Connell would receive 15 percent of the fees up to date. Since the State of Washington, O'Connell's official client, had an interest in the litigation, it was agreed that

O'Connell's share would be reduced to 10 percent which amounted to about $50,000. This allegedly was to avoid O'Connell's sharing in any manner in the recovery for the State of Washington. In other words, if O'Connell had received 15 percent he would have received an additional $50,000. Significantly, 9 days after O'Connell received his $101,250 share Alioto paid directly to Faler the sum of $50,000. That was the only payment made directly to Faler.

After both O'Connell and Faler had received their first shared fees, Faler negotiated a special agreement between Alioto and the Snohomish County PUD. He made no disclosure of fee sharing.

The next significant series of events began in October 1966, by which time most settlements had been reached. One of the attorneys on the Seattle corporation counsel's staff examined the books of WUAG and learned for the first time that (1) Faler in 1965 had changed from a staff assistant attorney general on salary to an hourly time basis. In that capacity he was paid $79,448.65; and (2) that the $1 million fee limit had been removed. Thereafter both Seattle and Tacoma requested a refund of the portion of the attorneys' fees paid. Without disclosing the fact that he and Faler had shared in those fees, O'Connell negotiated a refund of $116,916 to Seattle and $79,167 to Tacoma. At the expense of WUAG, O'Connell and Faler flew to San Francisco to discuss a refund with Alioto. Upon inquiry by Alioto as to whether plaintiffs knew O'Connell was sharing fees, O'Connell assured him that they all knew it even though he had never discussed it with any plaintiff or any of their attorneys. In early 1967 O'Connell sent $100,000 to Alioto and Faler sent $32,500. These funds were deposited in a special bank account with Joseph L. Alioto as trustee. Alioto created a trust account in the name of O'Connell as trustee and deposited his funds therein. These "trust" accounts were closed out into Alioto's regular checking account. O'Connell then flew to San Francisco, obtained Alioto's check and paid the refunds to Seattle and Tacoma. There was never any disclosure to Seattle or Tacoma that

O'Connell and Faler had contributed the refunds nor was there a disclosure of these refunds to any of the other plaintiffs.

Finally, in 1969, when newspaper articles appeared about the fee sharing, O'Connell told a Seattle reporter that he denied having had any private practice while Attorney General, characterizing such an allegation as sheer fabrication. When the successor Attorney General asked O'Connell whether he had shared fees with Alioto, O'Connell flatly denied it. O'Connell's explanation for the denial was that he thought the new Attorney General knew the details and that his question was "sort of a joke."

Alioto, on the other hand, was very frank when the news stories broke. He said he relied on O'Connell's statement that he had a right to practice law privately, that he represented the plaintiffs, other than the State of Washingon, as a private attorney, that they knew of his fee sharing, that he assumed that the fee limit was removed with complete authority in O'Connell and that from the very beginning in 1961 it was understood that there was to be a sharing of fees.

With these admitted facts in mind, certain preliminary observations can be made:

(1) The attorneys representing the various plaintiffs achieved excellent results and the total attorneys' fees were reasonable. Those facts are not in issue, however, and they resolve nothing.

(2) Defendant Alioto acted properly in both a legal and an ethical sense. He relied upon the attorneys who initiated their association, O'Connell and Faler. His dealings with the clients were entirely through O'Connell and Faler. There was no requirement for Alioto to go directly to the clients which he represented only as an associated attorney to challenge O'Connell's representations as to his status and authority. Alioto properly refused to pay a forwarder's fee but relied upon the division of work and effort which he agreed upon with O'Connell. Alioto's possible liability was

the subject of correct instructions and I would affirm the judgment in his favor.

(3) O'Connell either (a) represented the plaintiffs as Attorney General or (b) was acting merely as a voluntary coordinating agent or (c) represented them as a private attorney. In (a) and (b) it is clear that he could have no private compensation. Assuming, as O'Connell contends, that he necessarily represented the various nonstate plaintiffs as a private attorney, I would hold as a matter of law that he, and likewise Faler, violated the ethical duty of an attorney to disclose material facts to his client.

We start with the uncontrovertible premise that the attorney-client relationship is highly fiduciary in character. As stated in *In re Beakley,* 6 Wn.2d 410, 423, 107 P.2d 1097 (1940):

> "The relation of attorney and client has always been regarded as one of special trust and confidence. The law therefore requires that all dealings between an attorney and his client shall be characterized by the utmost fairness and good faith, and it scrutinizes with great closeness all transactions had between them. So strict is the rule on this subject that dealings between an attorney and his client are held, as against the attorney, to be prima facie fraudulent, and to sustain a transaction of advantage to himself with his client the attorney has the burden of showing not only that he used no undue influence but that he gave his client all the information and advice which it would have been his duty to give if he himself had not been interested, and that the transaction was as beneficial to the client as it would have been had the client dealt with a stranger." 7 C.J.S., Attorney and Client, § 127.

More specifically, Canon 38 of the Canons of Professional Ethics (which was in effect at the time of the actions complained of herein) declared that: "A lawyer should accept no compensation, commissions, rebates or other advantages from others without the knowledge and consent of his client after full disclosure." Thus, even if O'Connell *did* represent the nonstate plaintiffs as a private attorney, he violated Canon 38 by accepting compensation (in the form

of a commission or rebate) from "others"—namely, Alioto —without the consent of his clients. To interpret the word "others" so as to exclude the instant situation because the compensation here ultimately came from the unknowing client would lead to the absurd result that an attorney who is compensated without disclosure out of the pocket of a third party in a matter affecting a client is in violation of Canon 38, while an attorney who is secretly compensated out of his uninformed client's own funds is acting properly!

The American Bar Association issued a decision on this point when presented with the question of whether a city attorney could share fees with a municipal bond attorney who was to give an opinion on bonds to be issued by the city represented by the city attorney. The opinion states in part:

> But if there is a division of service and responsibility such as to justify a forwarder's fee, *the municipal solicitor ought always to make a full disclosure in the premises to his client.*
>
> Should the municipal solicitor conceal from his client the fact that he is receiving a "forwarder's fee" from bond counsel, the solicitor would be violating the fiduciary attorney-client relationship existing between him and his client and, of course, such practice would smack of commercialism.
>
> . . . In such a case [where there is a division of responsibility] a division of fees on a reasonable basis commensurate with the service performed and responsibility assumed by the solicitor will not be objectionable; *provided always that the solicitor does so with the consent of his client and makes full disclosure of the fee arrangement.*

(Italics mine.) Informal Decision 534, American Bar Association (1962). *Accord, East Tenn. & W.N.C. Ry. v. Robinson,* 19 Tenn. App. 265, 86 S.W.2d 433 (1935).

The simple unqualified statement of Henry Drinker, a recognized authority on legal ethics, is beyond dispute: "A lawyer must advise his client if he is to have a share of the charge of a colleague." H. Drinker, *Legal Ethics* at 173 (1953). Both O'Connell and Faler had a positive, affirma-

tive duty to make a full disclosure to the nonstate plaintiffs before entering into the formal fee sharing arrangement with Alioto.[12]

The cases cited by the majority for the proposition that a jury verdict will be overturned only when there is no substantial evidence supporting the verdict are inapposite here. It is uncontroverted that O'Connell made *no* disclosure to any plaintiff or any of their attorneys that he was sharing fees. In fact, O'Connell denies that he had any such duty, although he cites no authority to support this theory (indeed, he cites no authority at all in his 48-page brief). Alioto's brief addresses this issue only from the standpoint of Alioto's duty to disclose, which is materially different from O'Connell's obligations. As a matter of law we should hold that O'Connell and Faler violated their positive duty of disclosure.

Alternatively, if this question is to be treated as an issue for the jury, there was error in two respects. The trial court instructed as to the disclosure duty, but added that it applied to facts and circumstances

> which reasonably appear to be important to the client . . . and which the lawyer does not or reasonably should not have reason to believe that the client already knows from some other source . . . This duty does not require a lawyer to advise his client of matters which the client already knows or which the lawyer reasonably believes the client has already learned or will be advised from some other source or which are not important enough to the client under the circumstances of the relationship to reasonably call for disclosure.

This instruction eliminates the positive ethical duty of disclosure whenever the *lawyer* reasonably assumes that the

---

[12]The Code of Professional Responsibility, adopted effective January 1, 1972, sets forth this duty with even greater specificity. (CPR) DR 2-107 provides that:

(A) A lawyer shall not divide a fee for legal services with another lawyer . . . unless:

(1) The client consents to employment of the other lawyer *after a full disclosure* that a division of fees will be made.

(Italics mine.)

client knows of the matter or the *lawyer* believes the matter is unimportant. This qualification was devastatingly prejudicial to the plaintiffs in view of O'Connell's assertion that he assumed that plaintiffs must have known of the fee sharing, even though he failed to disclose it, and that in any event the plaintiffs just didn't care about it.

Appellants' requested instruction properly described the duty of an attorney as being to

> see to it that plaintiffs were fully advised of the nature and extent of any proposed division of fees between them and to obtain plaintiffs' approval and consent to any such division of fees prior to the negotiation of any contract providing for the payment of attorney fees to Mr. Alioto.

This instruction should have been given.

Obviously, a client cannot consent to a fee sharing agreement of which he has no knowledge. In such a critical aspect of the attorney-client relationship—a relationship of special trust and confidence—it is not enough for the attorney to assume, whether reasonably or otherwise, that the client approves. It is incumbent upon the attorney to verify that assumption by expressly making full disclosure of the proposed division of fees to the client and obtaining the client's explicit approval. The legal profession can tolerate no less.

There is further error in the trial court's exclusion of expert testimony from three witnesses as to the affirmative duty of a lawyer to disclose fee sharing. It was perfectly admissible because first, O'Connell said he had no such duty. He obviously was speaking as a lawyer and put the matter into issue. Second, the practice and duties of lawyers in this regard is not of such common knowledge as to be beyond the scope of expert testimony. We have held that expert testimony is admissible on the question of the competency of a judge, *Lynch v. Republic Pub. Co.*, 40 Wn.2d 379, 243 P.2d 636 (1952), and on the issue of conflict of interest, *Weber v. Biddle*, 4 Wn. App. 519, 483 P.2d 155 (1971).

There were several critical points at which the clients were entitled to know of fee sharing. First, after a discussion with Alioto about fee sharing, O'Connell took it upon himself to recommend employment of Alioto. Attorney E. K. Murray, in an offer of proof, made the reason perfectly clear why this should have been disclosed. He said there was such an obligation

> because he [O'Connell] was there as one of the attorneys for the joint participants in these proposed suits recommending the employment of another attorney when he, as a recommendor, had an undisclosed interest in either sharing in that fee or working on the case and earning the fee. He was in effect partly recommending the employment of himself undisclosed. And that, in my opinion, is contrary to the duty of a lawyer, period.

Second, there was an obvious conflict when the ceiling on the fee was removed. By virtue of that removal O'Connell and Faler received $652,814.16 in shared fees which they would not have received had the ceiling not been lifted. It strains reason beyond the breaking point to say that the clients were not entitled to know that fact.

Third, when O'Connell was negotiating a refund of fees with Seattle and Tacoma, there was a duty to disclose because of the conflict of O'Connell and Faler who were contributing to the refund. Again attorney Murray said it well:

> [H]e [O'Connell] was in a position of negotiating for repayment of fees presumably to Mr. Alioto representing Seattle and Tacoma, appeared on their behalf, whereas he himself had an adverse interest not to succeed in the duty which he assumed in behalf and didn't disclose.

Fourth, in making recommendations as to whether to settle a particular claim, O'Connell played a key role. Surely the client was entitled to know that the recommendations were being made by a lawyer with a direct interest in the dollars involved, rather than by a trusted public official bearing all the stature and authority of the state's highest elected legal officer.

I emphasize that these were positive affirmative duties resting on O'Connell and Faler. Mr. Alioto had no such duty unless he had reason to know of the concealment. In fact he was assured by O'Connell that the clients knew of the sharing.

The majority also errs in stating that the 1962 agreement with Alioto was never formally authorized or ratified by the plaintiffs. Seattle, for example, gave written approval. Tacoma was requested to and did give written approval. Faler, in writing, stated that he had obtained specific approval of the Alioto agreement by at least three of the plaintiffs, and in at least one instance Faler confirmed by letter that the terms of the agreement had been approved by certain PUD commissioners.

Finally, I must disagree with the majority's refusal to consider six of appellants' 16 assignments of error, each of which deals with the failure of the trial court to give appellants' proposed jury instructions. The majority contends that our consideration of these requested instructions is precluded by ROA I-34(9):

> In all cases whenever any error is predicated upon a ruling relative to an instruction given or proposed, it will be necessary to include in the statement of facts all of the instructions given by the court and those proposed instructions concerning which error is assigned.

To better evaluate the majority's position, it is helpful to review the relevant events. The original statement of facts, timely filed and served by appellants, contained all of the instructions given by the trial court, but did not include appellants' proposed instructions. On March 22, 1973, before any brief was filed, appellants filed a first supplemental transcript which included all of appellants' proposed jury instructions. Respondent Alioto suggested for the first time in his answering brief on July 9, 1973, that appellants' assignments of error relating to their proposed instructions were not properly before this court.[13] A supplemental statement of facts was served by appellants on August 9, certi-

---

[13]Respondents O'Connell and Faler have not raised this issue.

fied by the trial judge on September 19 and filed on September 20, 1973. This supplemental statement contained all of appellants' requested instructions in addition to all of the instructions given by the trial court. This court heard oral argument on the merits on October 24, 1973.

In applying ROA I-34(9) to these facts it is important to remember that we are not dealing with a jurisdictional requirement. ROA I-32 provides that:

> In order that the supreme court may secure jurisdiction of an appeal in a civil cause pursuant to ROA I-14, the appellant need only give timely notice of appeal (see Rule I-15, I-33).
>
> Failure of the appellant to take any further steps to secure the review of the order, judgment, or decree appealed from does not affect the validity of the appeal, but is ground for such remedies as are specified in these rules or, when no remedy is specified, for such action as the supreme court deems appropriate, which may include contempt, assessment of terms, costs or damages, and dismissal of the appeal.

Since the deletion from ROA I-32 in 1956 of the requirement of timely filing of a statement of facts as a jurisdictional prerequisite to review by this court, we have been hesitant to punish litigants for the neglect of their counsel. For example, we have instead sometimes imposed terms upon counsel. *See Beagle v. Beagle,* 55 Wn.2d 908, 349 P.2d 241 (1960); *accord, Neal v. Green,* 68 Wn.2d 415, 413 P.2d 339 (1966).

Since we do have wide discretion to dispose of violations of ROA I-34(9), we should consider the underlying reasons for that rule in determining whether there has been a violation here and, if so, what action is appropriate. In *Porter v. Chicago, M., St. P. & Pac. R.R.,* 41 Wn.2d 836, 839, 252 P.2d 306 (1953), we explained that:

> The principal reason for such requirements is that we must consider all of the instructions as a whole in determining whether the court erred in the particular instance claimed. In the case of a refused instruction, it may appear that the court has given one of sufficiently like

import, or it may appear that such instruction advanced a theory materially modifying or directly at variance with that adopted by the court in the instructions given.

In *Porter*, the statement of facts did *not* contain the instructions *given* by the trial court. Thus, this court was unwilling to assume that the jury instructions contained in the transcript were actually those given in the absence of a certificate to that effect from the trial judge. In the instant case, the original statement of facts did contain all of the instructions given by the trial court. Moreover, in *Porter* the deficiency was never corrected. Here, the original statement and supplement, which together contain all instructions given by the court and proposed by appellants, were on file for more than a month before oral argument. This court had adequate time to consider both the instructions given and those requested—all in certified form. *Cf. Kuhnhausen v. England*, 79 Wn.2d 282, 285, 484 P.2d 1135 (1971).

In addition to assisting this court, ROA I-34(9) is also intended to aid the respondent by insuring that he will be informed of the precise grounds upon which the appellant relies so that the respondent can direct the arguments in his answering brief accordingly. Therefore, in *Popovich v. Department of Labor & Indus.*, 66 Wn.2d 908, 406 P.2d 593 (1965), because the original statement of facts included neither the instructions given nor the instructions refused, we held that a supplemental statement of facts filed after respondent filed its brief would not be considered by this court.

In contrast, appellants' original statement of facts herein contained all of the instructions given to the jury, and all of appellants' requested instructions were included in the first supplemental transcript with was filed over 3 months before the filing of respondent Alioto's brief. In appellants' opening brief each of the proposed instructions upon which error is predicated is referred to by its page number in the supplemental transcript. The supplemental statement of facts, properly certified by the trial judge, leaves no doubt that the instructions set forth in the supplemental tran-

script are indeed the instructions which were actually submitted by appellants to the trial court.

Alioto does not suggest that he has in any way been prejudiced by the fact that appellants' proposed instructions were included initially in the transcript rather than in the original statement of facts, and I am unpersuaded by the majority's conclusion that he has somehow been "inconvenienced." Alioto devotes only a page and a half out of 89 in his brief to this technical procedural challenge to this court's consideration of the requested instructions. He then goes on to thoroughly respond on the merits to every one of appellants' assignments of error, skillfully attacking each of the proposed instructions in question.

The majority emphasizes that this is a complex, voluminous appeal. I agree. But that makes even more senseless the majority's refusal to consider and decide six significant legal questions merely because appellants' counsel have made one totally harmless technical "error." Here, as in *King County Republican Cent. Comm. v. Republican State Comm.*, 79 Wn.2d 202, 208, 484 P.2d 387 (1971), there was

no discernible or practical prejudice flowing to respondent, no unfairness to the trial judge, and no inconvenience to this court as a result of the belated certification of the record.

While the majority's unwillingness to consider appellants' requested instructions undoubtedly makes this appeal easier to dispose of, it does not make good law.

While I disagree with many of the conclusions reached by the majority, there is no point in extending this dissent by discussion of them since the above reasoning would be dispositive. I am compelled to add, however, that this appeal substantiates the theory of Mr. Justice Holmes that:

Great cases like hard cases made bad law. For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure

which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend.

*Northern Sec. Co. v. United States,* 193 U.S. 197, 400-01, 48 L. Ed. 679, 24 S. Ct. 436 (1904) (Holmes, J., dissenting opinion). Truly, this is a "great" case.

I dissent.

STAFFORD and WRIGHT, JJ., concur with BRACHTENBACH, J.

Petition for rehearing denied September 10, 1974.